## In re JCC HOLDING CO., INC. Shareholders Litigation

### C.A. No. 19796.

Court of Chancery of Delaware
New Castle County.

Submitted Sept. 10, 2003.
Decided Sept. 25, 2003.

Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Joshua Rubin, and Richard Margolies, Abbey Gardy, LLP, New York, New York; Gregory Egleston, Bernstein Liebhard & Lifshitz, LLP, New York, New York; Jonathan Stein, and Stuart Davidson, Cauley Geller Bowman & Rudman, LLP, Boca Raton, Florida, for Plaintiffs.

Kevin G. Abrams, Thomas A. Beck, J. Travis Laster, and Lisa M. Zwally, Richards, Layton & Finger, P.A., Wilmington, Delaware; Charles W. Cox, II, Latham & Watkins LLP, Los Angeles, California, for Defendants Stephen H. Brammell, Gary W. Loveman, Charles Teamer, Sr., Eddie N. Williams, Harrah's Entertainment, Inc., Harrah's Operating Company, Inc., Satchmo Acquisition, Inc., and JCC Holding Company.

Robert K. Payson, Michael A. Pittenger, and John M. Seaman, Potter, Anderson & Corroon LLP, Wilmington, Delaware, for Defendants Paul D. Debban, Preston Smart, and Christopher Lowden.

## OPINION

STRINE, Vice Chancellor.

In this case, prospective class plaintiffs challenge the fairness of a cash-out merger

between a corporation that owns a casino in New Orleans, JCC Holding Company ("JCC"), and its controlling stockholder, Harrah's. Because Harrah's owns a majority of JCC's shares, the merger is subject to the standard of review set forth in *Kahn v. Lynch Communication Systems, Inc.*[1] Thus, the entire fairness standard governs judicial review of the merger, regardless of the fact that the defendants contend that the merger was made conditional on approval of a majority of the JCC minority stockholders.

In this opinion, the court addresses the defendants' motion for judgment on the pleadings and the plaintiffs' motion to certify a class. Both motions are opposed and their resolution is intertwined. The defendants argue that the plaintiffs have failed to challenge the adequacy of the disclosures made to the JCC stockholders in the merger proxy statement and that the plaintiffs' disclosure claims should be dismissed. As a consequence of the plaintiffs' failure to plead proper disclosure claims, the defendants contend that most of the class proposed by the plaintiffs is barred from attacking the merger's fairness because they voted in favor of the merger. Likewise, the defendants claim that those members of the proposed class who voted against the merger but later accepted the merger consideration are also barred from any recovery. Once these two groups are deducted from the proposed class, the class becomes so small, say the defendants, that it fails to satisfy the numerosity requirement of Court of Chancery Rule 23(a)(1).

This opinion addresses the defendants' arguments in the following way. Initially, the opinion concludes that the defendants

are correct in arguing that the plaintiffs have failed to plead viable disclosure claims in their amended complaint.[2] Therefore, those claims will be dismissed.

By contrast, the opinion rejects the defendants' argument that the rejection of the disclosure claims constitutes an adequate basis for barring stockholders who voted yes on the merger or who later accepted the merger consideration from pressing a fairness challenge to the merger, and therefore also for excluding them from the proposed class. Because *Lynch* is premised on the empirical assumption that stockholder votes on mergers with controlling stockholders invariably involve a form of inherent coercion, that case denies ratification effect to minority approval of mergers of that kind. As a logical consequence, our law cannot – as the prior cases of *Clements v. Rogers*[3] and *In re Best Lock Corp. Shareholder Litigation*[4] hold – coherently say that minority stockholders "acquiesce" in the fairness of a merger with a controlling stockholder merely by voting yes or accepting the merger consideration. Rather, those actions simply have the effect of waiving any right to an appraisal remedy; they do not bar participation in an equitable challenge to the merger under the plaintiff-favorable fairness standard set forth in *Lynch*. So long as *Lynch* remains unaltered, the law of acquiescence must take it into account and operate coherently alongside it.

Given these conclusions, the plaintiffs' motion for class certification will be granted.

## I. *Factual Background*

JCC Holding Company owns and operates a casino known as the Harrah's New

---

1. 638 A.2d 1110 (Del.1994).

2. For the sake of brevity, the amended complaint is hereafter referred to simply as the complaint.

3. 790 A.2d 1222 (Del.Ch.2001).

4. 2001 WL 1398580 (Del.Ch. Oct.29, 2001).

Orleans Casino in New Orleans, Louisiana. Before the merger that is challenged in this litigation, 63% of JCC's stock was owned by defendant Harrah's Operating Company, Inc. Harrah's Operating Company is a wholly-owned subsidiary of defendant Harrah's Entertainment, Inc., and hereafter both companies are referred to singularly as "Harrah's." [5]

JCC had a rocky history. By the year that the merger took place, JCC had gone through two restructurings in bankruptcy and was the focus of a fight for control between Harrah's (and JCC directors affiliated with it) and certain other JCC stockholders and directors. Ultimately, Harrah's was able to tilt things its way, through the purchase of additional shares that increased its ownership from 49% to 63% and through a commitment to purchase the rest of the JCC shares that it did not already own.

Within the year leading to the merger, tensions had run so high that multiple lawsuits were filed involving the company. The then-JCC board majority caused a suit to be brought against Harrah's for mismanagement (the "Mismanagement Litigation"). For its part, Harrah's brought two suits. One sought a declaration that Harrah's could elect sufficient directors to obtain a new board majority at an upcoming JCC stockholders' meeting. The other, more relevant here, sought to invalidate certain option compensation purportedly granted to key JCC executives, including defendant Paul Debban, who was then JCC's president and director, and defendant Preston Smart, who was vice

president and director of JCC (the "Compensation Litigation").

The negotiations leading to the merger challenged here began when Harrah's first expressed its interest in acquiring the rest of JCC in March 2002. JCC formed a special committee to negotiate with Harrah's. The complaint challenges the independence and effectiveness of that committee.

In June 2002, while the negotiations between the special committee and Harrah's had been suspended, Harrah's struck a deal whereby it acquired approximately 1.7 million shares of JCC stock at $10.54 per share and certain JCC notes from Deutsche Bank Trust Company Americas for a total of $64.3 million. That purchase was critical, as it increased Harrah's ownership from 49% to 63%.

In late July 2002, after negotiations between Harrah's and the JCC special committee had resumed, the JCC special committee recommended approval of a merger agreement with Harrah's providing for Harrah's to pay the same price – $10.54 per share – for the rest of the JCC shares it did not own. Before taking that action, the special committee received advice from its financial advisor, Houlihan Lokey Howard & Zukin, that the deal price was fair to JCC's minority stockholders. Thereafter, JCC and Harrah's (and its relevant acquisition vehicle) entered into the merger agreement.

The same day, JCC entered into separation agreements with Debban and Smart, providing for them to each receive 308,-031 [6] options exercisable at $3.20 per share in exchange for waiving their rights under

---

5. The defendants argue, in a footnote in their opening brief in support of their motion for judgment on the pleadings, that while the complaint names as defendants Harrah's Entertainment, Harrah's Operating Company, and the relevant acquisition vehicle, these entities should be dismissed from the action because no claims are asserted against them. But the complaint does in fact assert claims

directly against Harrah's Entertainment, *see*, *e.g.*, Am. Compl. ¶ 52, and, reading the allegations in the light most favorable to the plaintiffs, I conclude that the complaint may be fairly read as asserting claims against the related Harrah's entities as well.

6. The proxy statement contains a slightly different figure. I use the number contained in the complaint.

the employment agreements challenged in the Compensation Litigation. The separation agreements contemplated the dismissal of the ·Compensation Litigation, which challenged larger grants that Debban and Smart had allegedly received.

The merger was put to a vote of the JCC stockholders on December 9, 2002. By its terms, the merger was conditioned upon the approval of a majority of the stockholders who were unaffiliated with Harrah's. This condition, however, was waivable by Harrah's.[7] At the meeting, the merger was approved, apparently with the overwhelming (indeed, nearly unanimous) support of the minority stockholders who cast votes.

## II. *The Parties' Contentions*

### A. *The Plaintiffs' Complaint*

The complaint in this action alleges that the merger was unfair. The plaintiffs contend that the special committee was comprised of directors who could not act independently on behalf of the minority stockholders, did not negotiate effectively, and received poor advice from its financial advisor, Houlihan. Furthermore, the plaintiffs allege that· the merger consideration was inadequate and, therefore, unfair.

In addition to their allegations that the merger was unfair, the plaintiffs attempt to state a claim that the disclosures contained in the proxy statement issued in connection ·with the merger vote were materially misleading. As will be seen, however, these allegations do not come close to stating a disclosure claim, as they simply involve allegations that information that did not exist (e.g., certain analyses that the plaintiffs believe Houlihan should have undertaken) should have been created in order to provide the JCC electorate with a full information base.

That is, the plaintiffs do not argue that the proxy statement's description of Houlihan's work and of other factors was in itself inaccurate or incomplete, they only argue that Houlihan or JCC management should have performed other analyses and disclosed the results. In addition, the plaintiffs claim that the proxy statement was misleading because it discussed analyses by Houlihan that the plaintiffs believe were "wrong," even though those analyses were fairly described. For example, Houlihan used companies as comparators in its comparable-companies analysis that were not, the plaintiffs contend, actually comparable to JCC. In similar vein, the plaintiffs allege that Houlihan used an inappropriate discount rate in certain of its analyses. In both instances, the plaintiffs do not claim that the proxy statement failed to fairly describe Houlihan's actual analysis; they instead argue that Houlihan's analysis was incorrect and that it was therefore mis-

---

**7.** Although the parties agree that the majority-of-the-minority condition in the merger agreement was waivable by its terms, the plaintiffs claim that the purported waivability of the condition was prohibited by JCC's bylaws. Before the merger, Article II, § 10 of JCC's bylaws provided that "[a]ny action required or permitted to be taken at a meeting of the stockholders must be taken [by a majority of JCC stockholders unaffiliated with Harrah's]." Am. Compl. ¶ 47. JCC's board purported to amend this bylaw before the merger to validate the waivability of the majority-of-the-minority condition in the merger agreement. The plaintiffs, however, argue that the bylaw amendment was invalid because Article II, § 10, by its terms, "may only be altered, amended, changed or repealed by an affirmative vote of not less than ninety percent (90%)" of the shares of JCC stock (including shares owned by Harrah's and its affiliates), a vote that they claim was not obtained. The defendants respond that this 90% requirement was inconsistent with JCC's charter, and therefore itself invalid, such that the purported bylaw amendment was successful.

This subsidiary dispute can be resolved at a later stage of the proceedings, if it ever becomes relevant.

leading to include it in the proxy statement.

## B. *The Defendants' Motion To Dismiss*

As readers familiar with Delaware's law of disclosure undoubtedly recognize, the types of allegations that the plaintiffs rely upon to support their disclosure claims invited seasoned defense counsel to seek their early dismissal. Thus, it is to be expected that the defendants have sought to dismiss them via a motion for judgment on the pleadings.

The deeper objective of the defendants' motion to dismiss the plaintiffs' disclosure claims is to use that lesser success as the basis for terminating the entire case as against most of the class that the plaintiffs contend should be certified in their motion. Under the defendants' reading of Delaware law, any JCC stockholder who voted in favor of the merger is barred from attacking the fairness of the merger. Presupposing that the defendants show that the plaintiffs' attacks on the proxy statement's sufficiency must be dismissed as meritless, the defendants would have shown that the minority voters who voted yes made an informed decision to accept the benefits of the merger. Having done so, these stockholders cannot be now heard to challenge the merger's fairness, under doctrines that have been variously described as involving acquiescence, estoppel or waiver, and which find support in Delaware case law like *Bershad v. Curtiss–Wright Corp,*[8] Likewise, the defendants argue that this same legal doctrine bars a recovery by those stockholders who voted no on the merger, but later decided to accept the merger consideration rather than seek appraisal.[9]

When considered together, these two groups of stockholders – i.e., those who voted yes and those who voted no but later accepted the merger consideration – constitute virtually all of the minority stockholders. If these stockholders are barred from attacking the merger, then no class should be certified at all, say the defendants, because the number of JCC stockholders who voted no and refused the merger consideration is extremely small and does not satisfy the numerosity standard of Court of Chancery Rule 23(a)(1). Alternatively, the defendants claim that the proposed class representative who voted no but later accepted the merger consideration, Michael Shapiro, cannot adequately represent the minority stockholders who voted no and also refused the merger consideration because Shapiro is subject to unique defenses, which renders his status atypical.

## III. *Legal Analysis*

The resolution of the other issues raised in the pending motions necessarily turns on the outcome of the defendants' motion for judgment on the pleadings as to the plaintiffs' disclosure claims. For that reason, I now address whether the plaintiffs' disclosure claims should be dismissed.

## A. *Should The Plaintiffs' Disclosure Claims Be Dismissed?*

 In resolving the defendants' motion for judgment on the pleadings, I apply

---

8. 535 A.2d 840 (Del.1987). In *Bershad,* a squeeze-out merger was challenged. The named plaintiff, Bershad, had voted against the merger but later accepted the merger consideration rather than seek appraisal. The Supreme Court affirmed the dismissal of his claims, stating:

 [W]hen an informed minority shareholder either votes in favor of the merger, or like Bershad, accepts the benefits of the transac-

 tion, he or she cannot thereafter attack its fairness. *Trounstine v. Remington Rand, Inc.,* Del. Ch., 194 A. 95, 99 (1937). Since Bershad tendered his shares and accepted the merger consideration, he acquiesced in the transaction and cannot now attack it. 535 A.2d at 848.

9. *Id.*

the familiar procedural standard of Rule 12(c). Under this standard, I must accept all well-pled allegations of fact in the complaint as true and draw all reasonable inferences in favor of the plaintiffs.[10] When addressing disclosure claims, I may consider the unambiguous terms of the proxy statement, which has been incorporated into the plaintiffs' complaint by reference.[11]

■ This court may also determine the materiality of alleged misstatements or omissions from the face of the proxy statement when that determination does not depend on factual disputes that can be resolved only after an evidentiary hearing. Our law is replete with examples of situations when this court has dismissed disclosure claims on challenges to the sufficiency of the complaint because the court's ability to consider the alleged omission or misdisclosure in the context of the entire proxy statement gave it a reliable basis from which to make a decision about materiality.[12]

■ It is, of course, well understood that the directors of a Delaware corporation must "disclose fully and fairly all material information within the board's control when it seeks shareholder action."[13] When the question the directors put to the stockholders is whether to approve a transaction such as a cash-out merger like the one challenged here, "[s]hareholders are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price."[14]

■■ The plaintiffs here contend that the JCC board breached these principles of fair disclosure in connection with the merger. But that is not so.

Rather, the plaintiffs argue, without citation to authority, that the JCC board failed to make fair disclosure because (1) it did not require Houlihan or company management to perform certain additional analyses and disclose the results of those analyses; and (2) it disclosed certain analyses Houlihan performed that the plaintiffs contend were incorrectly done. There is no need to burden the reader with a full recitation of examples in the complaint that fall into each category. A few examples of each will suffice.

In the first category, the plaintiffs argue that Houlihan should have conducted a discounted cash flow analysis of JCC. If it had done so, the plaintiffs argue, that analysis would have demonstrated that a minimally fair price for JCC shares was $12.50 per share, nearly $2 per share above the merger price.

■ Put bluntly, this speculative argument does not set forth a viable disclosure claim. The proxy statement forthrightly states that, although it is typical for Houlihan to perform a DCF valuation in connec-

10. E.g., McMillan v. Intercargo Corp., 768 A.2d 492, 499–500 (Del.Ch.2000).

11. E.g., id. at 500; In re Santa Fe Pac. Corp. S'holder Litig., 669 A.2d 59, 69–70 (Del.1995).

12. See, e.g., Orman v. Cullman, 794 A.2d 5, 32 (Del.Ch.2002) ("It is proper ... for this Court to address the question of the materiality of the plaintiff's alleged omissions in the context of a Rule 12(b)(6) motion to dismiss."); Skeen v. Jo–Ann Stores, Inc., 750 A.2d 1170 (Del. 2000) (affirming dismissal of disclosure claims on a Rule 12(b)(6) motion); Malpiede v. Townson, 780 A.2d 1075, 1086–87 (Del.

2001) (plaintiff has a burden to plead facts that provide a basis for the court to infer that an omission was material). Of course, if there is a plausible argument that an omission was material, then the complaint cannot be dismissed. See id.

13. Zirn v. VLI Corp., 681 A.2d 1050, 1056 (Del.1996) (quoting Stroud v. Grace, 606 A.2d 75, 84 (Del.1992)).

14. Eisenberg v. Chicago Milwaukee Corp., 537 A.2d 1051, 1059 (Del.Ch.1987) (stating disclosure standard in context of corporation's self-tender offer).

tion with a transaction like the merger, JCC did not have reliable recent long-term projections from which Houlihan could perform a DCF valuation analysis.[15] Under Delaware law, there is no obligation on the part of a board to disclose information that simply does not exist[16] – in this case, a non-existent DCF valuation and the other non-existent information that the plaintiffs identify in the complaint. This includes the plaintiffs' argument that the proxy statement was materially misleading insofar as it failed to include any "valuation" of the Mismanagement Litigation initiated by JCC against Harrah's and of the Compensation Litigation Harrah's had brought involving Debban's or Smart's options. No such valuations existed and the plaintiffs have not otherwise challenged the description of the substance of the lawsuits contained in the proxy statement.[17]

The second category of arguments involves, as noted, instances when the proxy statement sets forth parts of the Houlihan valuation analyses that the plaintiffs believe to be wrong. An example of this is the plaintiffs' contention that the Houlihan comparable-companies analysis used companies that the plaintiffs believe were not comparable to JCC. The plaintiffs do not contend that the proxy statement did not fairly describe the actual analysis Houlihan undertook; they simply contend that the analysis was flawed and therefore misleading. Nor do the plaintiffs argue that the proxy statement disclosed erroneous data (e.g., an inaccurate rendition of JCC's last three years' earnings or debt incurred) upon which Houlihan unwittingly relied. The plaintiffs' only beef is that Houlihan made mistakes in subjective judgment, even though those judgments were disclosed to the JCC stockholders.

This kind of quibble with the substance of a banker's opinion does not constitute a disclosure claim. The proxy statement obviously provided the plaintiffs with the material they needed to determine various ways in which they disagreed with Houlihan. This does not suggest the absence of fair disclosure; indeed, it inclines the mind in the opposite direction, because the proxy statement was written in a manner that allowed a reasonably sophisticated investor to see the key judgments that Houlihan made and to make her own independent determination of whether those judgments struck her as proper. For example, the proxy statement disclosed certain input factors Houlihan used in its analyses, such as discount rates and the costs of capital and equity used to derive them. The plaintiffs use this disclosure as a jumping-off point for an argument that the input factors Houlihan used were wrong and that it was therefore misleading to disclose them in the first place.

Accepting the plaintiffs' arguments about this second category would be injurious to stockholders. The penalty for providing a full summary of the work of an

---

15. The plaintiffs do not allege that the disclosure that there were no recent long-term projections was itself false. Although certain long-term projections were prepared in connection with JCC's bankruptcy reorganization in 2001 and were provided to Houlihan, the proxy statement indicated that Houlihan did not rely on those projections because of significant changes in circumstances since their preparation and because they had repeatedly not been met by JCC. Nonetheless, JCC disclosed the prior long-term projections in the proxy statement.

16. *E.g.*, *In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301, at *8 (Del.Ch. Aug.22, 1991) (rejecting argument that defendants "were affirmatively obligated to create (and then disclose)" valuations of a restructuring that they had not in fact undertaken).

17. The proxy statement described the lawsuits and indicated that they were in their early stages and that the outcomes could not be predicted with certainty.

investment banker that sets forth an informative description of the reasoning that led the banker to issue its fairness opinion would be subjection to a disclosure suit if the plaintiff can plausibly argue that the banker made subjective judgments in its valuation analysis that could be considered erroneous and that could have materially affected the outcome of its fairness determination. This is a perverse incentive system at odds with our law's encouragement of informative disclosure of the valuation analyses underlying fairness opinions supporting board recommendations of mergers.[18] The JCC board's duty was simply to make fair disclosure of the material facts in its possession bearing on the fairness of the merger it was putting before the stockholders. By setting forth a fair summary of the valuation work Houlihan in fact performed, the board met its obligation under our law.

For these reasons, the defendants' motion for judgment on the pleadings against the plaintiffs' disclosure claims is granted.

**B. Are The JCC Stockholders Who Voted Yes Or Who Otherwise Accepted The Merger Consideration Barred From Participating In A Class Challenging The Merger?**

Having shown that the plaintiffs' challenge to the proxy statement lacks poten-

cy, the defendants contend that they have shown that the JCC stockholders who voted in favor of the merger or who later accepted the merger consideration, in lieu of seeking appraisal, made a fully informed, non-coerced decision to acquiesce in the merger. Per *Bershad* and authority like it,[19] the defendants say that it is obvious that these JCC stockholders – who constitute almost all of the JCC minority electorate – are barred from any recovery. Once these stockholders are deducted from the proposed class, the plaintiffs' counsel are left with a handful of individual stockholders who can easily sue in their own names and who do not satisfy the numerosity requirement of Rule 23(a)(1).[20]

Until late in the briefing on the plaintiffs' motion for class certification, the plaintiffs floundered to find a retort to this line of argument, other than their (now-rejected) contention that they had stated disclosure claims that undermined the defendants' argument that the JCC minority stockholders were fully-informed. Eventually, however, the plaintiffs did latch on to a more viable argument, based on two recent decisions of this court: *Clements v. Rogers*[21] and *In re Best Lock Corp. Shareholder Litigation.*[22] Summarized succinctly, those two cases hold that a stockholder who casts a vote in favor of, or later

---

18. *See, e.g., In re Pure Resources, Inc., S'holders Litig.,* 808 A.2d 421, 448–50 (Del.Ch.2002) (discussing value of disclosures regarding investment bankers' analyses and stating that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely"); *Alidina v. Internet.com Corp.,* 2002 WL 31584292, at *11 (Del.Ch. Nov.6, 2002) (adopting same approach).

19. For a more recent case following *Bershad,* see *Norberg v. Security Storage Co.,* 2000 WL 1375868 (Del.Ch. Sept.19, 2000).

20. Cases like this one are quintessential examples of class actions. Aside from their acquiescence-based arguments, the defendants do not contest class certification or the suitability of the proposed class representatives. The plaintiffs' moving papers set forth an adequate basis for certifying the class as they propose, and their proposed implementing order sets forth the required findings under Rule 23. For that reason, this opinion solely addresses the issue argued by the defendants in their papers opposing class certification.

21. 790 A.2d 1222 (Del.Ch.2001).

22. 2001 WL 1398580 (Del.Ch. Oct.29, 2001).

accepts the consideration from, a merger effected by a controlling stockholder is not barred by the doctrine of acquiescence, or any other related equitable doctrine such as waiver, from challenging the fairness of the merger in an equitable action.

I will not burden the reader with a recitation of the full reasoning of *Clements* and *Best Lock* because those cases, taken together, set forth comprehensively the complicated evolution of Delaware's law of ratification and acquiescence as they apply to corporate mergers.[23] What is essential for present purposes is the teaching of *Clements* and *Best Lock* regarding the application of the doctrine of acquiescence to mergers governed by the special standard of review articulated in *Kahn v. Lynch Communication Systems, Inc.*[24]

 Because Harrah's owned 63% of JCC at the time the merger agreement was signed, the special standard of review *Kahn v. Lynch* articulates (the "*Lynch* doctrine") applies to the transaction under challenge in this case. Under the *Lynch* doctrine, a merger between a corporation and its controlling stockholder is subject to the entire fairness standard of review, regardless of the procedural protections used to effectuate the transaction. At best, the use of procedural protections such as an effective special committee of independent directors or a majority-of-the-minority vote condition can operate to shift the burden of persuasion on the issue of fairness from the defendants to show fairness, to the plaintiffs to demonstrate unfairness.

A fundamental premise of the *Lynch* doctrine is that controlling stockholders are reasonably perceived as having such potent retributive powers as to subject minority stockholders to inherent coercion in casting a vote on a squeeze-out merger.[25] This inherent coercion is thought to undermine the fairness-guaranteeing effect of a majority-of-the-minority vote condition because coerced fear or a hopeless acceptance of a dominant power's will, rather than rational self-interest, is deemed likely to be the animating force behind the minority's decision to approve the merger. As Chancellor Chandler pointed out in *Best Lock*, even if *all* of the minority stockholders approve a merger subject to the *Lynch* doctrine after receiving exemplary disclosure, the unanimous vote would not have the traditional ratification effect of extinguishing equitable challenges to the merger's fairness.[26]

 Given this logic, the viability of *Bershad* has been eclipsed in cases governed by the *Lynch* doctrine[27] – a doctrine

---

**23.** *See Clements*, 790 A.2d at 1235–1239; *Best Lock*, 2001 WL 1398580, at *11–16.

**24.** 638 A.2d 1110 (Del.1994).

**25.** *Id.* at 1116–17 (quoting *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 502 (Del.Ch.1990)). This is a finding of empirical fact rooted in the Supreme Court's perception of how the world works. That is, in the parlance of Kenneth Culp Davis, it is a "legislative fact." *See* Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 503 (2002) (citing Kenneth C. Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L.Rev. 364, 402–03 (1942)).

**26.** 2001 WL 1398580, at *15.

**27.** The fact that the transaction in *Bershad* was one that would now implicate the *Lynch* doctrine has obvious irony. Irrespective of that awkward reality, *Bershad* pre-dated *Lynch* and the latter's articulation of an inherent coercion rationale for failing to accord ratification effect to a fully informed majority-of-the-minority vote on a merger with a controlling stockholder. *Lynch* and its progeny implicitly but unmistakably operate to undermine the application of the holding in *Bershad* dealing with acquiescence to mergers with controlling stockholders.

that has only been more firmly embedded in our law by recent decisions of our Supreme Court.[28] As both *Clements* and *Best Lock* acknowledge, it would be illogical to bar stockholders who voted for or accepted the consideration from a merger governed by *Lynch* from any recovery, when *Lynch* is premised on the notion that these stockholders lack the free will to cast votes ratifying the fairness of the transaction, even after receiving full disclosure of the material facts.[29] Rather, the limited consequence of voting yes or accepting the merger consideration is loss of the right to seek appraisal, leaving the stockholder to recover only if she can prevail in a fairness proceeding under *Lynch*.[30]

The defendants obviously find this state of the law unsatisfactory, as it permits stockholders to vote to accept the benefits of a merger and then turn around and seek damages for the consummation of a transaction that they could have prevented themselves at the ballot box. Nonetheless, their argument that *Bershad* can be given vitality in cases governed by *Lynch* can only be accepted if this court is willing to blind itself to the incompatibility of these two cases.[31] It may well be that our law should give greater liability-insulating effect to fully informed votes of minority stockholders who are granted the power to block a squeeze-out merger.[32] But that advance should occur in a coherent manner, which necessitates an alteration to *Lynch* as a component of any attempt to breathe life into *Bershad* in cases involving mergers with controlling stockholders.

■ Therefore, because this case is governed by the *Lynch* doctrine, the vote of the minority stockholders in favor of the merger can, at best, operate to shift the burden of persuasion to the plaintiffs on the issue of fairness. Those stockholders who voted yes are not, by virtue of their votes, barred from recovery.[33] Similarly,

**28.** *See, e.g., Emerald Partners v. Berlin,* 787 A.2d 85, 93 n. 52 (Del.2001); *Kahn v. Tremont Corp.,* 694 A.2d 422, 428 (Del.1997).

**29.** *Clements,* 790 A.2d at 1238–39; *Best Lock,* 2001 WL 1398580 at *15.

**30.** *Clements,* 790 A.2d at 1238.

**31.** I suppose it is possible to argue that *Lynch* was designed only to protect stockholders who voted no and did not later accept the merger consideration from being foreclosed from receiving relief simply because a majority of other minority stockholders voted yes. But, the sweeping rhetoric of *Lynch* and its progeny, and their dependence on a doctrine of inherent coercion, is hard to square with the notion that the trampled down masses who gave way in the face of potential majority tyranny are to be denied relief because they succumbed.

That said, there might well still be room for some preclusive effect to be given to a stockholders' informed decision to vote yes on a transaction. As a matter of public policy, it might well make sense to refuse to allow stockholders who cast informed yes votes from serving as class representatives or deriv-

ative plaintiffs. The reason for this limited rule of preclusion would be to prevent repeat plaintiffs with limited holdings from being able to cast free yes votes and still instigate costly representative litigation. But the utility of that possible effect should be tested in a case when a defendant raises that argument and ties it to relevant provisions in Rule 23. Moreover, as *Best Lock* states, the mere fact that a plaintiff who voted no on a merger later foregoes appraisal and accepts the merger consideration should not be viewed, post-*Lynch*, as acquiescence. *See Best Lock,* 2001 WL 1398580, at *15.

**32.** *See In re Pure Resources, Inc., S'holders Litig.,* 808 A.2d 421, 444 & n. 43 (Del.Ch. 2002) (suggesting an alteration to *Lynch* along these lines).

**33.** Because the defendants have met their burden to obtain dismissal of the plaintiffs' disclosure claims, the burden shift will take place unless the plaintiffs can show that the vote should be disregarded for some other reason. Here, the possible reason is that JCC reserved the right to waive the majority-of-the-minority condition. If that reservation existed, the protection the condition gave to

the mere fact that a stockholder – such as Michael Shapiro, who is one of the class representatives – voted no and later accepted the merger consideration, does not bar him from recovering, but only from seeking appraisal. Given that reality, Shapiro is suitable to be one of the class representatives and the defendants' challenge to him on typicality grounds is without force.[34]

## IV. *Conclusion*

For the foregoing reasons, the defendants' motion for judgment on the pleadings is granted solely as to the plaintiffs' disclosure claims, and is otherwise denied, and the plaintiffs' motion for class certification is granted. The parties shall submit conforming orders within ten days.

the minority could be viewed as illusory. This issue should be resolved at a later stage of the case, when it is the focus of briefs.

34. As an aside, I note that the defendants' typicality argument was not strong even if a potential acquiescence defense was available. As to an issue like acquiescence, a party like Shapiro has the greatest incentive to represent other stockholders arguably subject to an acquiescence defense and the different positions of class members on the issue of acquiescence (i.e., those who voted no and rejected the merger consideration, those who voted no and later accepted the consideration, and those who voted yes) could be addressed fairly in one class action, with at most the *possible* need for the creation of subclasses. The acquiescence issue creates no conflicts within the proposed class, it simply poses the possibility that certain groups of class members might have to fight through an affirmative defense. In any event, the plaintiffs have also identified another proposed representative, Nechuma Cohen, whose adequacy and typicality is not challenged.

