Ehrlich v. Phase Forward Incorporated.

SELMA EHRLICH & another,[1] trustees,[2] *vs.* PHASE FORWARD
INCORPORATED & others.[3]

No. 10-P-1510.

Middlesex. April 6, 2011. - October 21, 2011.

Present: COHEN, KATZMANN, & VUONO, JJ.

*Corporation,* Merger, Board of directors. *Fiduciary. Conflict of Interest.*

In a civil action arising from the sale of a corporation, the corporation's direc-
tors did not commit a breach of their fiduciary duties to the corporation's
shareholders, under Delaware law, in conducting the sale process, where
the plaintiff shareholders failed to allege conflicts of interest that are
recognized as such under Delaware law [675-680], and where the directors
did not fail utterly to obtain the best sale price for the shareholders, in
conscious disregard of their duty of loyalty [680-681]; further, there was
no merit to the claim that the proxy statement provided to shareholders
failed to disclose material information that have would permitted such
shareholders to determine how to vote on the proposed merger [681-685];
consequently, there was no merit to the plaintiffs' claims against the acquired
corporation and the purchasing corporations for aiding and abetting the
directors in the alleged breach [685].

CIVIL ACTION commenced in the Superior Court Department on
April 20, 2010.

Motions to dismiss were heard by *Leila R. Kern,* J.

*Cullin Avram O'Brien* for the plaintiffs.

*Deborah S. Birnbach* for Axel Bichara & others.

*Michael S. Hines* for Oracle Corporation & another.

KATZMANN, J. This case arises in the world of mergers and
acquisitions. The plaintiffs, former shareholders in Phase For-
ward Incorporated (Phase Forward), appeal from a Superior Court

[1]Richard M. Ehrlich.

[2]Of the Selma Ehrlich Rev. Trust.

[3]Axel Bichara, Paul A. Bleicher, Richard D'Amore, Gary Haroian, Paul G.
Joubert, Kenneth I. Kaitin, Dennis Shaughnessy, Robert K. Weiler, Oracle
Corporation, and Pine Acquisition Corporation.

judge's dismissal of their claims against Phase Forward's directors stemming from that company's sale to Oracle Corporation and Pine Acquisition Corporation (collectively, Oracle). The plaintiffs alleged that the directors breached their fiduciary duties to Phase Forward's shareholders, under Delaware law, in conducting the sale process and in failing to disclose material information in the proxy statement provided to shareholders. They also alleged that Phase Forward and Oracle aided and abetted Phase Forward's directors in the breach. In accordance with *Lyondell Chem. Co.* v. *Ryan*, 970 A.2d 235 (Del. 2009) (*Lyondell*), and well-established principles of Delaware law, we affirm.

*Background.* We summarize the facts from the amended complaint and the accompanying proxy statement, which we accept as true. At the time they initiated this action, the plaintiffs, Selma Ehrlich and Richard Ehrlich, trustees of the Selma Ehrlich Rev. Trust, owned shares of Phase Forward common stock. Phase Forward was then a publicly traded Delaware corporation with its principal place of business in Waltham. It provided software products and services for use in its customers' global clinical trial and drug safety monitoring activities. Named as defendants were Phase Forward and Oracle, along with the members of Phase Forward's board of directors. According to the amended complaint, only one of the directors was employed as a member of Phase Forward's management.

In 2006, Oracle expressed interest in acquiring Phase Forward, and the two companies discussed the possibility over the next three years. In April, 2009, Oracle offered to purchase Phase Forward for $16 per share. Phase Forward's board of directors established a special committee of independent and disinterested directors to consider the offer, and sought the advice of Thomas Weisel Partners (TWP), an investment banking firm. TWP contacted four potential purchasers to determine market interest in Phase Forward; none came forward. Ultimately, Phase Forward rejected the offer.

In March, 2010, Oracle renewed its offer of $16 per share. Phase Forward again established a special committee of independent and disinterested directors and authorized TWP to contact potential purchasers to test the market. TWP contacted five

companies, but again, none was interested. Phase Forward rejected Oracle's offer, and Oracle increased the offer to $16.75, and then to $17 per share, for a total purchase price of approximately $756 million. At that time, the price of $17 per share represented approximately a thirty percent premium over the trading price of Phase Forward stock. Phase Forward's directors determined that the offer appeared to provide substantial value to the shareholders and could well exceed the potential for growth in the value of the shares should Phase Forward continue as a stand-alone entity. TWP provided an opinion that the price to be paid Phase Forward's shareholders was fair.

Phase Forward's board negotiated with Oracle for a reduction in the termination fee[4] and a "fiduciary out" provision that allowed the board to consider unsolicited offers from other companies after the proposed merger was announced. On April 15, 2010, the board of directors, the majority of whom were disinterested, unanimously approved the offer and announced the merger the following day. No other companies came forward with offers to purchase Phase Forward after the merger was announced.

On May 14, 2010, Phase Forward filed a preliminary proxy statement with the United States Securities and Exchange Commission (SEC); Phase Forward followed with a definitive proxy statement on May 24, 2010.[5] The proxy statement, which was sent to Phase Forward's shareholders, outlined the process leading to the board's decision to recommend the merger, summarized the accompanying fairness opinion by TWP and the merger agreement, and disclosed the interests of the directors and executive officers in the merger. Those interests included previously-granted stock options, previously-signed severance

---

[4]A termination fee of $24.7 million was to be paid by Phase Forward to Oracle in the event Phase Forward terminated the merger agreement prior to its approval by Phase Forward's shareholders, in order to accept a superior proposal.

[5]The amended complaint included the preliminary proxy statement, which formed the basis for the plaintiffs' disclosure claims. The plaintiffs based their subsequent motion for a preliminary injunction on the definitive proxy statement, which they have included in a supplemental record appendix. According to the defendants, the two versions of the proxy statement are nearly identical. For our purposes, we refer to the proxy statement that is attached to the amended complaint in the record appendix.

agreements, and compensation to two directors for their service on the 2010 special committee. The proxy statement also stated that Phase Forward management and employees were expected to continue employment with Oracle after the merger.

After the proxy statement was filed with the SEC, two independent shareholder advisory firms, International Shareholder Services and Glass, Lewis & Co., LLC, advised Phase Forward shareholders to vote for the merger. They based their recommendations, among other things, on the thoroughness of Phase Forward's sale process.

Shortly after the merger was announced, the plaintiffs filed this action in Superior Court, on behalf of themselves and other Phase Forward shareholders, claiming that the board failed to conduct a thorough and adequate sales process, and that the board provided insufficient information to Phase Forward's shareholders about the merger. The plaintiffs sought a preliminary injunction to enjoin the shareholder vote on the sale, scheduled for June 22, 2010. The defendants moved to dismiss the complaint for failure to state a claim under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974). Following lengthy oral argument, a Superior Court judge denied injunctive relief and dismissed the amended complaint. The plaintiffs did not pursue an interlocutory appeal from the denial of their motion for a preliminary injunction. They appeal here from the allowance of the defendants' motion to dismiss.

*Discussion.* The parties rely on Massachusetts law regarding the standard for dismissal of a complaint under Mass.R.Civ.P. 12(b)(6), and on Delaware law for the merits, and we do the same. Accordingly, in reviewing the sufficiency of the amended complaint, "[w]e take as true 'the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiff's favor.' " *Golchin* v. *Liberty Mut. Ins. Co.*, 460 Mass. 222, 223 (2011), quoting from *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995). In so doing, we consider the allegations in the complaint, as well as the proxy statement attached thereto. *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000). "Factual allegations must be enough to raise the right to relief above the speculative level." *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008), quoting from *Bell Atl. Corp.* v. *Twombley*, 550 U.S. 544, 555 (2007).

1. *Fiduciary duty in conducting the sale.* While Delaware courts ordinarily defer to the managerial decisions of directors in accordance with the business judgment rule, the transfer of corporate control has triggered more active judicial oversight. At that point, the directors' role changes "from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders." *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del. 1986). When the sale of the corporation is contemplated, the Supreme Court of Delaware has imposed a duty on the directors to seek the best value reasonably available for the shareholders, and their efforts have been subject to enhanced scrutiny by the courts. *Paramount Communications Inc.* v. *QVC Network Inc.,* 637 A.2d 34, 46 (Del. 1994), citing *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.,* 506 A.2d at 182-184. The fiduciary duties imposed upon directors in those circumstances are referred to as "*Revlon* duties." See, e.g., *Mills Acquisition Co.* v. *Macmillan, Inc.,* 559 A.2d 1261, 1288 (Del. 1989). In *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc., supra,* it was held that Revlon's directors impermissibly allowed their own interests, rather than the maximization of shareholder profit, to affect their judgment in approving the sale of Revlon to one of two bidders.

Subsequent cases addressed the methods by which the directors could fulfil their *Revlon* duties, emphasizing the importance of disinterested directors and their assessment of material information in the sale process, to ensure the best value for the shareholders. *Paramount Communications Inc.* v. *QVC Network Inc., supra* at 44-46, and cases cited. "Nevertheless, there is no single blueprint that a board must follow to fulfill its duties." *Barkan* v. *Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del. 1989). "*Revlon* is merely one of an unbroken line of cases that seek to prevent conflicts of interest that arise in the field of mergers and acquisitions by demanding that directors act with scrupulous concern for fairness to shareholders." *Ibid.*

More recently, in *Lyondell,* 970 A.2d at 242, the Supreme Court of Delaware held that it was error to conclude "that directors must follow one of several courses of action to satisfy their *Revlon* duty." Rather, "[t]here is only one *Revlon* duty —

to '[get] the best price for the stockholders at a sale of the company.' " *Id.* at 242, quoting from *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*, 506 A.2d at 182. In assessing their performance, therefore, "[i]nstead of questioning whether disinterested, independent directors did everything that they (arguably) should have done to obtain the best sale price, the inquiry should have been whether those directors utterly failed to attempt to obtain the best sale price." *Id.* at 244. In *Lyondell*, it was determined that the directors, despite their failure to conduct a market check before agreeing to a single purchaser's offer, did not breach their duty of loyalty by failing to act in good faith. *Ibid.* The court held it sufficient that the directors met several times to consider the offer, attempted to get a better offer from the purchaser, knew the value of their company and the relevant market, and followed the advice of their financial and legal advisers.

In *Lyondell*, the court "clarified a number of important aspects of this doctrine, including when *Revlon* duties arise, the absence of any specific steps that directors must take when determining to embark on a sale of control transaction, and the heavy deference afforded independent and disinterested directors in this setting." Aronstam & Ross, Retracing Delaware's Corporate Roots Through Recent Decisions: Corporate Foundations Remain Stable While Judicial Standards of Review Continue to Evolve, 12 Del. L. Rev. 1, 9 (2010). The upshot of *Lyondell* is that "[i]n the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." *Lyondell, supra* at 243, quoting from *In re Lear Corp. Shareholder Litigation*, 967 A.2d 640, 654-655 (Del. Ch. 2008).[6] See, e.g., *In re Bank of Am. Corp. Secs.*, 757 F. Supp. 2d 260,

---

[6]Decisions since *Lyondell* indicate "that it will be significantly more difficult for a stockholder plaintiff under the heightened standard adopted by *Lyondell* to establish that an independent and disinterested board 'utterly failed to obtain the best price.' " Aronstam & Ross, Retracing Delaware's Corporate Roots Through Recent Decisions: Corporate Foundations Remain Stable While Judicial Standards of Review Continue to Evolve, 12 Del. L. Rev. at 13 n.74. As another commentator observed, "*Lyondell* is a sea change." Lederman, Deconstructing Lyondell: Reconstructing Revlon, 55 N.Y.L. Sch. L. Rev. 639, 642 (2010/2011).

337 (S.D.N.Y. 2010) (allegations that the board's review and approval of a merger was inadequate did not state a claim that the directors acted disloyally or in bad faith).

In this case, the judge properly relied on the standard set forth in *Lyondell.* The judge determined that the plaintiffs' amended complaint failed to allege conflicts of interest on the part of the directors and, accordingly, she applied the more deferential *Lyondell* analysis for disinterested directors conducting a sale. In keeping with that standard, the judge reasoned that the amended complaint did not allege facts to establish that the board utterly failed to attempt to obtain the best sale price for Phase Forward shareholders. On appeal, the plaintiffs challenge the judge's ruling that they failed to allege conflicts of interest on the part of the directors and that the directors did all that was required of them in the sale process.

a. *Disinterested board.* The plaintiffs fail to address or even acknowledge *Lyondell.* Rather, they apparently seek to avoid its application by relying on allegations that, in their view, established that the directors had a conflict of interest in the sale to Oracle, thereby triggering a more exacting scrutiny of the transaction than *Lyondell* requires. See, e.g., *Paramount Communications Inc.* v. *QVC Network Inc.,* 637 A.2d at 42 n.9 (actual self-interest that affected a majority of the directors approving a transaction calls for "even more exacting scrutiny" to determine fairness to the shareholders).

The Supreme Court of Delaware has defined interest in this context to mean "that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson* v. *Lewis,* 473 A.2d 805, 812 (Del. 1984), overruled on other grounds by *Brehm* v. *Eisner,* 746 A.2d 244 (Del. 2000). To challenge the merger on the basis of a conflict of interest, the plaintiffs must show either that a majority of the board suffered from a conflict of interest or that one or more directors, though less than a majority, suffered from a conflict of interest and either dominated the board as a whole or failed to disclose his or her conflict to the board. *Cinerama, Inc.* v. *Technicolor, Inc.,* 663 A.2d 1156, 1168 (Del. 1995).

Here, the alleged conflicts of interest that the plaintiffs press on appeal are not recognized as such under Delaware law. The plaintiffs argue that the continued employment of Phase Forward management and employees after the purchase by Oracle somehow worked a personal benefit to the directors. But Delaware cases make clear that management's expectation of employment with the new company is not, in itself, sufficient to establish a conflict of interest on the part of the directors. See, e.g., *id.* at 1170; *McMillan* v. *Intercargo Corp.*, 768 A.2d 492, 504 (Del. Ch. 2000).

The plaintiffs also point to the reduction in size of the special committee between 2009 and 2010, but they do not connect the reduction to self-interest on the part of the directors. See *Iannacchino* v. *Ford Motor Co.*, 451 Mass. at 633 (plaintiffs must include allegations that would connect the defendant's failure to a legal requirement). Furthermore, an inference that the special committee was deliberately reduced to remove members opposed to the Oracle sale, and thereby, presumably, to benefit management in its quest for continued employment, is not reasonable in light of the assertion in the proxy statement that the board unanimously recommended the sale. See *Schaer* v. *Brandeis Univ.*, 432 Mass. at 477-478 (though we indulge every reasonable inference in plaintiff's favor, subjective characterizations and conclusory descriptions will not suffice).

Similarly lacking is the plaintiffs' allegation concerning the $20,000 payments to two directors serving on the 2010 special committee. The plaintiffs do not contest the propriety of paying extra compensation to directors who serve on a special committee, but they attempt to draw a causal connection between the $20,000 payments to the two special committee members here and the board's failure to contact a broader range of buyers, suggesting that the failure was because of the payments to those two members. Again, the plaintiffs omitted an allegation explaining the manner in which the $20,000 payments, which were for their additional services in connection with the special committee, constituted a personal benefit to the directors that would cause them to favor the sale to Oracle over a sale to a different kind of buyer.

Putting the cart before the horse, the plaintiffs argue that the

directors' failure to contact a broader range of buyers, in itself, demonstrated the directors' conflict of interest. We will not infer that the directors were self-interested from allegations that the manner in which they conducted the sale process was flawed. See *id.* at 479. For the same reason, the plaintiffs' claim that the special committee failed to hire its own independent financial and legal advisers, apart from those assisting the directors in the sale, does not support an inference that the directors had a conflict of interest.

Without referencing the clear import of *Lyondell, supra,* the plaintiffs urge that we rely on *In re Netsmart Technologies, Inc. Shareholders Litigation,* 924 A.2d 171, 197-198 (Del. Ch. 2007), for the proposition that directors must canvass two different types of buyers, both strategic and financial, when conducting a sale of the company, and that the failure to do so amounts to a breach of their fiduciary duties.[7] That is not an accurate portrayal of the case. The trial judge in *In re Netsmart Technologies, Inc. Shareholders Litigation, supra,* determined that the sale was not conducted by disinterested directors and applied a more exacting analysis for that reason. The judge noted in particular that despite the advice of the company's financial advisers to explore both financial and strategic buyers, management steered the sale of the company to a financial buyer, apparently for their own personal benefit. *Id.* at 182-183. The judge also observed that the disinterested directors had "little involvement" in the decision-making during the sale process. *Id.* at 188. Finally, the judge concluded that management was influenced by the prospect that they would maintain control of the business after the sale while significantly increasing their share of equity, opportunities that a financial buyer would offer and a strategic buyer would not. *Id.* at 197-198.

Here, the amended complaint and proxy statement demonstrate that a majority of the Phase Forward directors were disinterested, that the sale was conducted with significant board involvement

---

[7]*Netsmart* referred to strategic buyers as larger companies in the same industry as Netsmart that would acquire Netsmart to add its software to their larger array of products and services. See *In re Netsmart Technologies, Inc. Shareholders Litigation,* 924 A.2d at 179. Financial buyers, on the other hand, would acquire Netsmart for investment purposes and, in Netsmart's case, would take the company from public to private. *Id.* at 181-182.

and oversight, and that the sale was approved unanimously by the board. Indeed, according to the amended complaint, only one board member, Robert K. Weiler, was employed with Phase Forward's management.[8] Based on the allegations of the amended complaint, the suggestion that the other directors pursued the sale to Oracle so that Weiler would have continued employment after the merger is unduly speculative. See, e.g., *In re Lukens Inc. Shareholders Litigation*, 757 A.2d 720, 730 (Del Ch. 1999) (plaintiff unsuccessfully challenged a sale on the basis of the buyer's promise to pay a "golden parachute" to a director who was also the chief executive officer but failed to allege that that director "dominated or controlled a majority of the board" or that he failed to disclose his self-interest to the board).

b. *The sale process.* Where the allegations of the amended complaint failed to show a conflict of interest on the part of the directors, the standard outlined in *Lyondell* applies. The inquiry, then, is whether the directors utterly failed to obtain the best sale price for the shareholders, in conscious disregard of their duty of loyalty. *Lyondell*, 970 A.2d at 244.

Regarding the plaintiffs' claim that the directors were required to canvass both strategic and financial buyers, the court in *Lyondell, supra*, rejected the notion that the directors must conduct an auction or market check to ensure they have obtained the best price, explaining that "there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties." *Id.* at 243-244 ("We assume, as we must on summary judgment, that the Lyondell directors . . . did not even consider conducting a market check before agreeing to the merger"). Accordingly, "the directors' failure to take any specific steps during the sale process could not have demonstrated a conscious disregard of their duties." *Id.* at 243.

The specific steps that Phase Forward's directors did take during the sale process cannot reasonably be characterized as an utter failure to attempt to obtain the best price for Phase Forward shareholders. The proxy statement established that the special committee and the full board of directors met on numer-

---

[8]According to the amended complaint, Weiler was chairman of the board of directors and Phase Forward's president and chief executive officer.

ous occasions to consider Oracle's offer, both with and without management participation. They negotiated an increase in Oracle's offer from $16 to $17 per share. They obtained the advice of independent financial advisers and outside legal counsel. They discussed, among other things, the amount of Oracle's offer and other terms of Oracle's proposal, the market check conducted by TWP, and benefits of the offer in light of Phase Forward's strategic business plan and prospects going forward as an independent entity. They negotiated a reduction in the exclusivity period, as well as a reduction in the termination fee and a "fiduciary out" provision in the merger agreement that allowed Phase Forward to consider superior offers from other buyers once the proposed merger was announced.[9]

Despite the allegations of the amended complaint concerning what Phase Forward's directors failed to do in the sale process, *Lyondell* instructs that "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Id.* at 243. We conclude that the allegation that the directors failed to canvass financial buyers does not state a claim, under Delaware law, that the directors breached their duty of loyalty to Phase Forward shareholders.

2. *Proxy statement disclosure.* The plaintiffs additionally claim that the proxy statement they received from Phase Forward's directors contained material omissions that left the shareholders unable to determine how to vote on the merger.[10]

When issuing a proxy statement, "the board is obligated 'to

[9]The plaintiffs point out that a "fiduciary out" provision in the merger agreement in *In re Netsmart Technologies, Inc. Shareholders Litigation*, 924 A.2d at 197-198, was deemed insufficient by the judge, given Netsmart's small size and single-analyst coverage, to offset the board's failure to canvass strategic buyers beforehand. As the judge here noted, Netsmart's sales price was $115 million, with a single research analyst following its stock; Phase Forward's sale price was $756 million, with seven research analysts following its stock. As such, the plaintiffs have not shown that the difficulty in attracting market attention that concerned the judge in *Netsmart* was present here.

[10]Because the plaintiffs did not seek money damages and did not appeal from the denial of their motion for a preliminary injunction, the defendants argue that the disclosure claims are moot. See, e.g., *Wayne County Employees' Retirement Sys.* v. *Corti*, 954 A.2d 319, 329 (Del. Ch. 2008) ("disclosure violations . . . can only be truly remedied by a specific, injunctive order mandating the appropriate disclosure before the shareholders are required to

disclose fully and fairly all material information within the board's control.' " *Malpiede* v. *Townson*, 780 A.2d 1075, 1086 (Del. 2001), quoting from *Stroud* v. *Grace*, 606 A.2d 75, 84-85 (Del. 1992). Materiality of information in this context has been defined as "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Arnold* v. *Society for Savs. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994), quoting from *TSC Indus.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976). "To survive a motion to dismiss, the plaintiffs 'must provide some basis for a court to infer that the alleged violations were material.' " *Malpiede* v. *Townson*, 780 A.2d at 1086-1087, quoting from *Loudon* v. *Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997). "For example, a pleader must allege that facts are missing from the statement, identify those facts, state why they meet the materiality standard and how the omission caused injury." *Id.* at 1087. That the undisclosed information would have been helpful in valuing the company does not establish that it was material. *Skeen* v. *Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

   Much of the plaintiffs' argument on appeal is directed at the disclosures in the proxy statement concerning TWP, the board's financial adviser that issued an opinion that Oracle's offer of $17 per share was fair. The proxy statement contained an eight-page summary of TWP's analysis, and TWP's opinion itself was appended to it.

   First, the plaintiffs complain that the proxy statement failed to disclose that TWP did not use a control premium in its comparable company analysis. A control premium represents an amount that compensates minority shareholders for their loss of voting power resulting from a merger that vests voting power in

vote"). The plaintiffs counter that they do not seek to undo the merger, and that they would amend their complaint to seek damages for the alleged disclosure violations. It is not clear that money damages are an available or appropriate remedy here. See, e.g., *In re Triarc Cos.*, 791 A.2d 872, 877 (Del. Ch. 2001) (only appropriate remedy for disclosure claims was equitable or injunctive relief, rather than damages); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 362 (Del. Ch. 2008) (court declined to grant money damages, sought after the merger closed, for disclosure violations in the proxy statement). As we decide that the plaintiffs' disclosure claims are without merit, we do not reach the issue.

a majority shareholder. *Paramount Communications Inc.* v. *QVC Network Inc.*, 637 A.2d at 42-43. The cases upon which the plaintiffs rely address valuation in shareholder appraisal actions under Del. Code Ann. tit 8, § 262,[11] wherein use of a control premium was deemed necessary to correct the implicit minority trading discount in a comparable company analysis. See, e.g., *Agranoff* v. *Miller*, 791 A.2d 880, 892-894 (Del. Ch. 2001). But the plaintiffs do not establish that TWP was required to use a control premium in its comparable company analysis in this context, or that the lack of disclosure regarding whether a control premium was used was a material omission that would have significantly altered their assessment of the offer. The Supreme Court of Delaware has made clear that financial information required in an appraisal action does not inform materiality in the context of the directors' duty of disclosure in a proxy statement. *Skeen* v. *Jo-Ann Stores, Inc.*, 750 A.2d at 1174. On that point, we are further persuaded by the defendants' citation to In re SunGard Data Sys., Inc. Shareholders Litigation, Del. Ch. Ct., No. CA 1221-N (July 8, 2005), wherein the trial judge ruled that failure to disclose in the proxy statement whether the board's financial adviser used a control premium was, "at best, of marginal significance."

Second, contrary to the plaintiffs' claim, the proxy statement does disclose whether TWP utilized more than one set of projections in the financial analyses of the proposed merger. The proxy statement plainly states that the financial projections relied upon were those prepared as of April, 2010, and that those projections were not updated since that time. The directors were not required to provide additional projections that were not utilized by TWP in its opinion, or to provide enough financial information so as to permit shareholders to make their own independent determination of fair value. See *Skeen* v. *Jo-Ann Stores*, 750 A.2d at 1174.

Third, the plaintiffs claim that the proxy statement failed to disclose how TWP determined that a price of $17 per share was

[11]Pursuant to § 262, shareholders who do not wish to accept the price offered for their shares pursuant to a merger agreement may elect to petition the court for a determination of fair value, which is calculated without reference to the effect of the proposed merger on the value of the shares.

fair, when its comparable company analysis suggested otherwise. However, the proxy statement summarized the results of all the analyses performed by TWP and the information and assumptions that contributed to TWP's opinion. It specifically cautioned that reliance on any one aspect or particular analysis described in the opinion would not adequately explain TWP's recommendation.[12] "By setting forth a fair summary of the valuation work [TWP] in fact performed, the board met its obligation under our law," *In re JCC Holding Co. Shareholders Litigation*, 843 A.2d 713, 722 (Del. Ch. 2003), and a "quibble with the substance of a banker's opinion does not constitute a disclosure claim." *Id.* at 721. As for the claim of missing free cash flow estimates that provided the basis for injunctive relief in *Maric Capital Master Fund, Ltd.* v. *PLATO Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010), upon which the plaintiffs rely, those estimates were included in the proxy statement here.

Additional claims regarding omission of TWP's alleged conflicts of interest are similarly unfounded. The proxy disclosed that TWP at times traded in Phase Forward and Oracle securities, and that TWP's fees were contingent on the sale. See *In re Toys "R" Us, Inc. Shareholder Litigation*, 877 A.2d 975, 1005 (Del. Ch. 2005) (contingent fees for financial advisers in a merger context have been recognized as proper by Delaware courts). The board was not required to disclose why TWP's fees were contingent on the sale. See generally *Newman* v. *Warren*, 684 A.2d 1239, 1245-1246 (Del. Ch. 1996) (directors need not disclose the reasons for their actions and recommendations). "Asking 'why' does not state a meritorious disclosure claim." In re Sauer-Danfoss Inc. Shareholders Litigation, Del. Ch. Ct., No. CA 5162-VCL (April 29, 2011).

Moreover, regarding the board's failure to explain why they

---

[12]TWP's comparable company analysis calculated the average share price for Phase Forward common stock at $14.99 to $23.91. Of the several calculations that made up the comparable company analysis, the plaintiffs highlight one in particular, which was based on adjusted earnings before interest, taxes, stock-based compensation, depreciation, and amortization, and placed the stock value at $19.17 to $20.50 per share. In addition to the comparable company analysis, TWP also performed a comparable transactions analysis, placing the stock value at $11.31 to $19.96 per share; a last-twelve-months trading analysis, placing the average trading price at $14 per share; and a discounted cash flow analysis, placing the stock at $15.71 to $18.23 per share.

did not canvass financial buyers, why the special committee was reduced in size, and why two special committee members received additional compensation, we agree with the judge that the plaintiffs cannot succeed on their breach of disclosure claim for omissions in the proxy statement that essentially reflect the plaintiffs' failed substantive claims of director wrongdoing in the sale process. *In re Lukens, Inc. Shareholders Litigation*, 757 A.2d at 736. See *In re Lear Corp. Shareholder Litigation*, 926 A.2d 94, 111 (Del. Ch. 2007). Where the directors have described the sale process in considerable detail, they are not required "[t]o have added information explaining why the Director Defendants did not take other steps or follow another process." *In re Lukens, Inc. Shareholders Litigation*, 757 A.2d at 736.

3. *Aiding and abetting.* On appeal, the plaintiffs fail to support the merits of their aiding and abetting claim against Phase Forward and Oracle with any legal authority, and merely argue that the companies were included as indispensable parties. As we determine that the plaintiffs' claims for breach of fiduciary duty were properly dismissed, the claims against Phase Forward and Oracle for aiding and abetting the directors in the breach were properly dismissed as well.

*Judgment affirmed.*