# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TESLA MOTORS, INC. STOCKHOLDER LITIGATION | ) ) ) | CONSOLIDATED C.A. No. 12711-VCS |

## MEMORANDUM OPINION

Date Submitted: November 4, 2019
Date Decided: February 4, 2020

Jay W. Eisenhofer, Esquire, Christine M. Mackintosh, Esquire, Kelly L. Tucker, Esquire and Vivek Upadhya, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware; Daniel L. Berger, Esquire of Grant & Eisenhofer P.A., New York, New York; Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, Robin Winchester, Esquire and Justin O. Reliford, Esquire of Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania; and Randall J. Baron, Esquire, David T. Wissbroecker, Esquire and Maxwell R. Huffman, Esquire of Robbins Geller Rudman & Dowd LLP, San Diego, California, Attorneys for Co-Lead Plaintiffs.

David E. Ross, Esquire, Garrett B. Moritz, Esquire and Benjamin Z. Grossberg, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and Evan R. Chesler, Esquire, Daniel Slifkin, Esquire, Vanessa A. Lavely, Esquire and Helam Gebremariam, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Director Defendants Elon Musk, Brad W. Buss, Robyn M. Denholm, Ira Ehrenpreis, Antonio J. Gracias, Stephen T. Jurvetson and Kimbal Musk.

**SLIGHTS, Vice Chancellor**

Tesla, Inc. ("Tesla") acquired SolarCity Corporation ("SolarCity") in 2016 by merger (the "Merger"). Several stockholders initiated lawsuits in this Court challenging the Merger, and those lawsuits have now been consolidated. The lead plaintiffs allege direct and derivative claims against both Elon Musk ("Musk"), as Tesla's controlling stockholder, and Tesla's Board of Directors (the "Board") for breaches of fiduciary duty in connection with the Merger.

In 2017, Defendants moved to dismiss under Court of Chancery Rule 12(b)(6). In pressing for dismissal, Defendants argued, as a matter of law, that the Court must review the breach of fiduciary duty claims against all Defendants under the business judgment rule because Musk was not a conflicted controlling stockholder at the time of the Merger and a majority of Tesla's disinterested stockholders approved the Merger in a fully informed, uncoerced vote.[1]

On March 28, 2018, this Court issued a Memorandum Opinion (the "2018 Opinion") denying Defendants' Motion to Dismiss.[2] Specifically, the Court held Plaintiffs had pled sufficient facts to allow a reasonable inference that Musk was Tesla's controlling stockholder, thereby triggering entire fairness review.[3]

---

[1] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015) (holding that business judgment review is appropriate when a transaction not subject to entire fairness is approved by disinterested stockholders in a fully informed, uncoerced vote).

[2] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293 (Del. Ch. Mar. 28, 2018).

[3] *Id.* at *19.

1

The parties have completed discovery and now bring cross motions for summary judgment.[4] Defendants urge the Court to enter complete summary judgment in their favor on three grounds: (1) after conducting extensive discovery, Plaintiffs have failed to unearth any evidence that would undermine Defendants' stockholder ratification defense since there is no evidence that Musk, as the alleged conflicted controller, actually coerced Tesla's stockholders into approving the Merger; (2) the disinterested stockholder vote approving the Merger was both uncoerced and fully informed, thereby triggering business judgment review; and (3) the Merger did not constitute corporate waste.

For their part, Plaintiffs seek partial summary judgment on two grounds: (1) that a majority of the Tesla Board was conflicted with regard to the Merger; and (2) that the stockholder vote approving the Merger was not fully informed. By Plaintiffs' lights, if they win on these issues, Defendants will be required to prove

---

[4] The parties advised the Court last week that they had reached an agreement in principle to settle all claims against all defendants, except the claims brought against Elon Musk. D.I. 381. During a subsequent status conference, this Court requested the parties to address whether this proposed settlement affects the cross-motions for summary judgment addressed in this Memorandum Opinion. In response, the parties have advised the Court that they agree the proposed settlement does not affect the cross-motions. D.I. 383; D.I. 384. As Plaintiffs have asserted each of their claims against both the settling defendants and Musk, and no claim is specific to any settling defendant, I agree.

entire fairness at trial regardless of how the Court decides Plaintiffs' claim that Musk was Tesla's controlling shareholder at the time of the Merger.[5]

The issues raised in the cross-motions implicate settled issues of Delaware corporate law, except one. Defendants maintain that while our law might permit Plaintiffs to defeat a motion to dismiss by invoking a presumption of "inherent coercion" arising from Musk's position as an alleged conflicted controller, having now been afforded full discovery, Plaintiffs can no longer ask the Court to presume that Musk's status as a conflicted controller coerced any Tesla stockholder into approving the Merger. According to Defendants, in the absence of evidence that Musk actually coerced Tesla's disinterested stockholders into approving the Merger, their stockholder ratification defense is case dispositive because the stockholder vote was fully informed, the standard of review, therefore, is the business judgment rule, and there is absolutely no evidence of corporate waste. Defendants acknowledge that no Delaware authority directly supports this position.[6] Nevertheless, they maintain that no Delaware authority would excuse a stockholder plaintiff from proving that the controller actually exploited his influence to advance self-interest at the expense of the minority stockholders as a basis to trigger entire fairness review.

[5] Neither party has argued that the Court can decide whether Musk was Tesla's controlling stockholder based on undisputed facts. If Defendants do not prevail on summary judgment, it appears the parties agree that the controlling stockholder issue will be decided after trial.

[6] Oral Argument on Cross-Mots. for Summ. J. ("OA") at 35.

3

I acknowledge that Defendants have raised a provocative argument regarding the extent to which a pleadings stage determination that a stockholder conceivably is a "controlling stockholder" owing fiduciary duties to the minority stockholders should remain intact throughout the litigation absent proof of actual coercion. The argument raises the practical question of what quantum of evidence is required actually to *prove* (rather than plead) breach of fiduciary duty claims resting on the theory that a conflicted controlling stockholder and beholden directors overwhelmed the will of the minority to advance the controller's self-interest. While I commend Defendants for their ingenuity, I decline to accept their position that the notion of "inherent coercion," as relates to controlling stockholders, evaporates when the case moves beyond the pleading stage. As explained below, I find no support for that position in our Supreme Court's existing precedent.

I likewise decline to accept Plaintiffs' arguments that there are no genuine issues of material fact regarding either Board-level conflicts or the particular disclosure claims they have proffered for summary adjudication. In doing so, I apply the well-vetted principle that the trial court should not grant summary judgment when it has questions that are best answered after a careful examination of the evidence at trial. With that said, I do believe Defendants have exposed certain disclosure claims that are not viable, either as a matter of undisputed fact or as a

4

matter of law. In the interest of focusing presentations at trial, I grant summary judgment to Defendants on those discreet claims.

## I. BACKGROUND

The Court addressed the facts underlying this dispute extensively in the 2018 Opinion so I need not rehash them here.[7] The dispute is relatively straightforward. The Merger of Tesla and SolarCity closed in November 2016. Defendants maintain the Merger was the product of a valid exercise of the Defendants' business judgment and furthers Tesla's long-term goal of building a fully integrated, sustainable alternative energy business. According to Defendants, a majority of Tesla's disinterested stockholders saw the wisdom of the Merger, as expressed in their vote to approve it. Plaintiffs, on the other hand, allege the Merger is the product of Musk's (and others') desire to save the failing SolarCity, a company in which he had a significant interest, and further allege that Musk and the other Defendants wrongfully caused Tesla assets to be diverted for the ill-advised bailout.

The parties return to the Court for case dispositive relief after developing a full evidentiary record comprising numerous depositions and interrogatory responses and voluminous documents.[8] While the record is extensive, the questions

---

[7] *Tesla*, 2018 WL 1560293, at *1–11.

[8] I will cite to Plaintiffs' exhibits as "PX__," Defendants' exhibits as "DX__," and depositions as "(Name) Dep. #."

5

called in the cross-motions for summary judgment are primarily legal questions that depend very little on the factual record. At the risk of repetition, I summarize those legal arguments, briefly, below.

As noted, Defendants' Motion for Summary Judgment advances three arguments. First, Defendants argue as a matter of law that Plaintiffs cannot sustain a claim of breach of fiduciary duty against Musk as a controlling stockholder with respect to the Merger because they have developed no evidence that Musk actually coerced the stockholder vote.[9] Next, Defendants argue there is no genuine dispute of material fact that the stockholder vote was fully informed and uncoerced.[10] According to Defendants, with an undisputed record of a fully informed, uncoerced vote of disinterested stockholders in favor of the Merger, the breach of fiduciary duty claims collapse under the weight of stockholder ratification, which ratchets down the standard of review from entire fairness to the business judgment rule, thereby "insulating the directors from all claims except waste."[11] Finally, Defendants argue, "it has been understood that stockholders would be unlikely to

[9] Defs.' Opening Br. in Supp. of Their Mot. for Summ. J. ("Defs.' OB") 29–42.

[10] *Id.* at 50–65.

[11] *Corwin*, 125 A.3d at 311 n.19, 314 (Del. 2015) (quotations omitted). As Plaintiffs' unjust enrichment claims are duplicative of their fiduciary duty claims, those would be dismissed as well. *See* Defs.' OB 65; Pls.' Answering Br. in Opp'n to Director Defs.' Mot. for Summ. J. ("Pls.' AB").

6

approve a transaction that is wasteful," and Plaintiffs have not met the heavy burden of showing the transaction "was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[12] Therefore, Defendants argue, Plaintiffs' claim for waste cannot succeed and judgment must be entered in Defendants' favor on all counts.[13]

Plaintiffs' Motion for Partial Summary Judgment rests on two arguments. First, Plaintiffs argue there is no genuine dispute of material fact that a majority of Tesla's directors faced disabling conflicts with respect to the Merger.[14] Next, they argue there is no genuine dispute of material fact that the stockholder vote was uninformed because Tesla withheld material information about: (1) SolarCity's true financial condition, including a liquidity crisis that threatened the company's solvency; (2) the assumptions underlying Evercore's financial analysis of the Merger; and (3) Musk's involvement in negotiating and evaluating the Merger that contradicts disclosures describing his recusal.[15] According to Plaintiffs, a win for

---

[12] *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016); *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quotations omitted).

[13] Defs.' OB 68.

[14] Pls.' Opening Br. in Supp. of Their Mot. for Partial Summ. J. ("Pls.' OB") 1.

[15] *Id.* at 55–67.

them on both of these issues would result in Defendants having to prove at trial the Merger was entirely fair to Tesla.[16]

I address Defendants' motion first and find that their stockholder ratification defense is not ripe for summary judgment. As for Plaintiffs' motion, I find that it is desirable to inquire more thoroughly into the facts before deciding whether a majority of the Tesla Board was conflicted or whether the stockholder vote approving the Merger was fully informed.

## II. ANALYSIS

There is no "right" to summary judgment.[17] Indeed, summary judgment may only be granted when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law."[18] When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party."[19] The court will decline to enter summary

---

[16] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) ("Entire Fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest."); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995) ("Where . . . the presumption of the business judgment rule has been rebutted, the board of directors' action is examined under the entire fairness standard."); *Corwin*, 125 A.3d at 306 (holding that any stockholder vote must be "fully informed" to cleanse a tainted transaction).

[17] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[18] Ct. Ch. R. 56(c).

[19] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992).

judgment "when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[20] With these well-settled standards in mind, I turn to the cross-motions.

## A. The Practical Implications of Musk's Status as a Controlling Stockholder

The gravamen of Defendants' summary judgment argument is that Plaintiffs' failure to offer proof that Musk, as Tesla's alleged controlling stockholder, actually coerced disinterested stockholders into voting to approve the Merger is fatal to their breach of fiduciary duty claims.[21] Plaintiffs acknowledge they have not attempted to develop that evidence in discovery.[22] Nevertheless, they argue Defendants' ratification argument fails because it ignores our law that Musk's status as controlling stockholder carries with it a presumption that he possesses "inherently coercive" influence over the other stockholders.[23]

---

[20] *Guy v. Judicial Nominating Comm'n*, 659 A.2d 777, 780 (Del. Super. Ct. 1995). *See also Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *Phillips v. Schifino*, 2009 WL 5174328, at *1 (Del. Ch. Dec. 18, 2009); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660, at *3 (Del. Ch. Oct. 9, 1998).

[21] Defs.' OB 4–5.

[22] OA at 64–65.

[23] *Id.* at 48–49.

To resolve the parties' dispute over the practical, post-pleadings implications of the Court's determination that Musk, conceivably, is Tesla's controlling stockholder, I examine: (1) the rationale for holding that a minority blockholder can, in some instances, be regarded as a controlling stockholder; (2) the origins of, and rationale for, the notion of "inherent coercion" in our controlling stockholder jurisprudence; and (3) the reasons we subject transactions involving conflicted controllers to our law's most rigorous standard of review, entire fairness. This analytical sequence leads me to conclude that if Plaintiffs prove that Musk was a controlling stockholder at the time of the Merger, his inherently coercive influence over the other Tesla decision-makers, including the disinterested stockholders, justifies and, indeed, mandates entire fairness review of the Merger.

### 1. The Controlling Shareholder Inquiry

While every stockholder with majority voting control is a controller, not every controller is a majority stockholder.[24] A minority blockholder can, as a matter of law, be a controlling stockholder through "a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock."[25] "The requisite

---

[24] *See Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994) ("[A] shareholder owes a fiduciary duty only if it owns a majority interest in or *exercises control* over the business affairs of a corporation.") (internal quotations omitted).

[25] *Corwin*, 125 A.3d at 307.

degree of control can be shown to exist generally or 'with regard to the particular transaction that is being challenged.'"[26]

While Musk's 22.1% voting share is well below the majority threshold, "there is no absolute percentage of voting power that is required in order for there to be a finding that a controlling stockholder exists . . . ."[27] "[T]he focus of the [controller] inquiry [is] on the *de facto* power of a significant (but less than majority) shareholder, which, *when coupled with other factors*, gives that shareholder the ability to dominate the corporate decision-making process."[28]

This court has held that one of these "other factors" is "managerial supremacy."[29] In *In re Cysive, Inc.*, when deciding post-trial that the plaintiffs had proven a minority blockholder was a controlling shareholder, the court gave great weight to the minority blockholder's role as a company's "hands-on" CEO and

---

[26] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (quoting *Williamson v. Cox Commc'ns Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006)).

[27] *In re PNB Hldgs. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[28] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) (emphasis supplied). *See also In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (holding a minority blockholder is a controller when "as a practical matter, [he] possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes").

[29] *Cysive*, 836 A.2d at 552.

11

"inspirational force" who was "involved in all aspects of the company's business."[30] Additional "other factors" might include a company's public statements acknowledging that the minority blockholder "[is] able to exercise significant influence over our company" and that a loss of the blockholder "would have a material adverse effect on our business and operations."[31]

The cases where this court has found that a minority blockholder was, in fact, a controlling stockholder recognize that it is the controller's "ability to dominate the corporate decision-making process" that is important to the controlling stockholder analysis.[32] The fact that the minority blockholder's "combination of stock voting power and managerial authority . . . *enables* him to control the corporation, if he so wishes" is what makes him a controlling stockholder.[33] In other words, the "*ability*" to control, rather than the actual *exercise* of control, is the determinative factor in our controlling stockholder jurisprudence.[34]

---

[30] *Id.*

[31] *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7 (Del. Ch. Nov. 26, 2014) (*rev'd on other grounds, In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015)). *See also In re Loral Space and Commc'ns Inc.*, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008) (noting that the minority blockholder's public statements regarding its control supported the finding after trial that the minority blockholder was a controlling shareholder).

[32] *See Superior Vision Servs., Inc.*, 2006 WL 2521426, at *4.

[33] *Cysive*, 836 A.2d at 553 (emphasis added).

[34] *Superior Vision Servs., Inc.*, 2006 WL 2521426, at *4.

12

## 2. The Doctrine of Inherent Coercion

Why the focus on the ability to control rather than the exercise of control in the "other factors" analysis? The answer, I think, is the recognition that a controller's influence is "inherently coercive." The presumption of "inherent coercion," as such, was first articulated by then-Vice Chancellor Jacobs in *Citron v. E.I. Du Pont de Nemours & Co.*[35] Four years later, the Supreme Court followed suit in its seminal *Kahn v. Lynch*, where the Court quoted *Citron* at length:

> The controlling stockholder relationship has the *potential to influence*, however subtly, the vote of [ratifying] minority stockholders in a manner that is not likely to occur in a transaction with a noncontrolling party.
>
> Even where no coercion is intended, shareholders voting on a parent subsidiary merger might perceive that their disapproval could risk retaliation of some kind by the controlling stockholder. For example, the controlling stockholder might decide to stop dividend payments or to effect a subsequent cash out merger at a less favorable price, for which the remedy would be time consuming and costly litigation. At the very least, the potential for that perception, and its possible impact upon a shareholder vote, could never be fully eliminated . . . Given that uncertainty, a court might well conclude that even minority shareholders who have ratified a . . . merger need procedural protections beyond those afforded by full disclosure of all material facts. One way to provide such protections would be to adhere to the more stringent entire fairness standard of judicial review.[36]

---

[35] 584 A.2d 490, 502 (Del. Ch. 1990) (articulating that a controlling stockholder "has the inherent potential to influence" minority stockholders).

[36] *Lynch*, 638 A.2d at 1116–17 (emphasis supplied) (*quoting Citron*, 584 A.2d at 502).

In *Kahn v. Tremont Corp.* ("*Tremont II*"), the Supreme Court again embraced *Citron*'s inherent coercion paradigm, writing, "[t]he risk is thus created that those who pass upon the propriety of the [interested merger] transaction might perceive that disapproval may result in retaliation by the controlling shareholder."[37] In holding that the inherently coercive effect of the controlling shareholder could not be fully mitigated, the Court again held entire fairness applies "to 'interested transactions' in order to ensure that all parties to the transaction have fulfilled their fiduciary duties to the corporation and all its shareholders."[38] That conflicted controller transactions are inherently coercive—"a finding of empirical fact rooted in the Supreme Court's perception of how the world works"[39]—is a fixture of our

---

[37] *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997).

[38] *Id.* at 428–29 (*quoting Lynch*, 638 A.3d at 1110).

[39] *In re JCC Hldg. Co., Inc.*, 843 A.2d 713, 723 n.25 (Del. Ch. 2003). In *JCC*, the court well-explained the difficulties with applying a straight stockholder ratification defense to transactions involving a conflicted controller (albeit in the squeeze-out context):

> A fundamental premise of the *Lynch* doctrine is that controlling stockholders are reasonably perceived as having such potent retributive powers as to subject minority stockholders to inherent coercion in casting a vote on a squeeze-out merger. This inherent coercion is thought to undermine the fairness-guaranteeing effect of a majority-of-the-minority vote condition because coerced fear or a hopeless acceptance of a dominant power's will, rather than rational self-interest, is deemed likely to be the animating force behind the minority's decision to approve the merger. As Chancellor Chandler pointed out in *Best Lock*, even if *all* of the minority stockholders approve a merger subject to the *Lynch* doctrine after receiving exemplary disclosure, the unanimous vote would not have the traditional ratification effect of extinguishing equitable challenges to the merger's fairness.

14

law endorsed by our highest court and re-emphasized in numerous decisions of this court.[40]

This is not to say the theory of inherent coercion is without critics. Some of our state's leading jurists, including the judge who first articulated the doctrine, have written that inherent coercion is not a substantial concern when the stockholder vote approving a conflicted transaction is otherwise uncoerced and fully informed.[41] The authors of *Function Over Form*, each renowned scholars of Delaware corporate law, observed, "[i]n our opinion, experience has shown that that concern (inherent coercion) is too insubstantial to justify a review standard that requires judges to second-guess a business transaction that rational investors have approved."[42]

---

*Id.* at 723 (citing *In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057 (Del. Ch. 2001)).

[40] *See, e.g., Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019); *Tornetta v. Musk*, 2019 WL 4566943, at *4 (Del. Ch. Sept. 20, 2019); *RCS Creditor Trust v. Schorsch*, 2017 WL 5904716, at *10 n.158 (Del. Ch. Nov. 30, 2017); *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *2 (Del. Ch. May 31, 2017); *Larkin v. Shah*, 2016 WL 4485447, at *9 (Del. Ch. Aug. 25, 2016); *In re EZCORP Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *20 (Del. Ch. Jan. 25, 2016); *In re Best Lock Corp. S'holder Litig.*, 845 A.2d at 1082; *JCC Hldg.*, 843 A.2d at 723 n.25; *Cysive*, 836 A.2d at 552; *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002); *Clements v. Rogers*, 790 A.2d 1222, 1238 (Del. Ch. 2001).

[41] *See* William T. Allen, Jack B. Jacobs & Leo E. Strine Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. L. 1287, 1308–09 (2001) (hereinafter "*Function Over Form*"). *See also In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 647 (Del. Ch. 2005) ("By now, experience has proven that special committees and independent board majorities are willing to say no to controllers.").

[42] *Function Over Form*, at 1308.

15

Perhaps this view is correct. But even its proponents recognized in their scholarly advocacy for doctrinal change that inherent coercion is a presumption embedded in our law.[43] This court follows Supreme Court precedent,[44] and that precedent is clear: transactions involving conflicted controllers must be reviewed for entire fairness, even when the transaction is approved by stockholders, because, in such instances, the stockholder vote is presumed to be coerced.[45]

### 3. Controlling Stockholders and Entire Fairness

Subjecting conflicted controller transactions to heightened entire fairness review to mitigate the threat of inherent coercion is also in line with the theoretical underpinnings and development of our state's entire fairness jurisprudence. The entire fairness standard has its origins in the duty of loyalty.[46] In this tradition, our Supreme Court has famously stated, "[t]here is no 'safe harbor' for [] divided loyalties in Delaware."[47] "The requirement of fairness is unflinching in its demand

---

[43] *Id.*

[44] *American Int'l Gp., Inc. v. Greenberg*, 965 A.2d 763, 818 (Del. Ch. 2009) ("[O]ur Supreme Court rightly expects . . . that our state's trial courts will [apply Supreme Court precedent].").

[45] *Lynch*, 638 A.2d at 1116–17; *Tremont II*, 694 A.2d at 428.

[46] *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.").

[47] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

16

that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[48]

One of the fundamental purposes of the entire fairness standard of review is to provide a framework for this court to review transactions involving conflicted controllers.[49] A conflicted controller has strong incentives to engage in transactions that benefit him to the detriment of the corporation and its other stockholders.[50] And, as an "800-pound gorilla" in the board room and at the ballot box, the controller has retributive capacities that lead our courts to question whether independent directors or voting shareholders can freely exercise their judgment in approving transactions sponsored by the controller.[51] In these circumstances, shareholders are

---

[48] *Id.*

[49] *See Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952) ("Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property. Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts."); *Keenan v. Eshleman*, 2 A.2d 904, 908 (Del. 1938) ("The appellants were in absolute control of both corporations. As directors, they were trustees for the stockholders, and the utmost good faith and fair dealing was exacted (sic) of them, especially where their individual interests were concerned . . . . Dealing as they did with another corporation of which they were sole directors and officers, they assumed the burden of showing the entire fairness of the transaction.").

[50] *See EZCORP*, 2016 WL 301245, at *2–3, 21–23 (discussing the economic incentives a controller has to engage in "non-*pro rata* transactions").

[51] *Pure Res.*, 808 A.2d at 436.

entitled to an independent review where the controller is made to explain why the transaction's process and price were fair.[52]

If the facts proven at trial demonstrate that Musk was Tesla's controller at the time of the Merger, Defendants will still avoid liability if the transaction was fair. Entire fairness review of the Merger is not a prejudgment that fiduciary misconduct occurred.[53] It is simply a recognition that because conflicted controller transactions have such strong potential for self-dealing, absent replication of an arm's-length transaction process,[54] an independent judge should thoroughly examine the transaction's substantive fairness.[55] As there remain genuine disputes of material fact as to whether Musk is Tesla's controlling stockholder, Defendants' Motion for

---

[52] *Weinberger*, 457 A.2d at 711.

[53] *See Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del. 2001) ("A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability.").

[54] The Tesla Board elected not to implement the dual protections endorsed by *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) as a means to earn business judgment review. Thus, the only remaining question is which party will bear the burden of proof as the Court reviews the Merger for entire fairness. To be more precise, whether Plaintiffs or Defendants will bear the burden of showing the Merger was or was not entirely fair will depend on the Court's determination of whether the vote of unaffiliated stockholders was informed. *See Lynch*, 638 A.2d at 1116 (holding that approval of a conflicted controller transaction by an informed vote of the majority of the minority stockholders shifts the burden of proving unfairness to the plaintiffs).

[55] *See In re MFW S'holders Litig.*, 67 A.3d 496, 502 (Del. Ch. 2013), *aff'd, Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (describing the two-step process a conflicted controller transaction must follow to be entitled to business judgment deference); *Lynch*, 638 A.2d at 1115.

Summary Judgment predicated upon the defense of stockholder ratification must be denied.

## B. There are Genuine Disputes of Material Fact as to Whether the Stockholder Vote Was Fully Informed

Both Plaintiffs and Defendants have moved for summary judgment on certain of the disclosure claims pled in the Complaint. Plaintiffs argue they are entitled to summary judgment because there is no genuine issue of material fact that: (1) Tesla did not adequately disclose that SolarCity was on the verge of insolvency at the time of the Merger; (2) Evercore's financial analysis of SolarCity on behalf of Tesla omitted material information; and (3) Tesla's disclosures of Musk's role in negotiating the transaction were materially misleading.[56]

In response to Defendants' Motion for Summary Judgment, where Defendants argue the disclosures were adequate as a matter of law, Plaintiffs identify two additional disclosure issues: (1) whether Tesla misrepresented the status of SolarCity's solar roof product; and (2) whether Tesla misrepresented the expected financial impact of the Merger on Tesla.[57] According to Plaintiffs, while the evidence regarding these disclosure deficiencies is not undisputed, the alleged deficiencies are ripe for adjudication at trial and provide sufficient bases to deny

---

[56] Pls.' OB at 56–68.

[57] Pls.' AB at 57–63.

19

Defendants' Motion for Summary Judgment on the validity of the stockholder vote for ratification purposes.

Directors have a "fiduciary duty to disclose fully and fairly all material information within the board's control when [they] seek[] shareholder action."[58] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[59] Put differently, an omitted fact is material if it would have "significantly altered the total mix of information made available."[60] A failure adequately to disclose all material facts to voting shareholders will serve both as bases for director liability and to preclude a stockholder vote from having a ratifying effect.[61] In this latter regard, the burden of demonstrating that a vote was fully informed "falls squarely on the board."[62]

---

[58] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[59] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[60] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (quoting *TSC Indus.*, 426 U.S. at 449).

[61] *Stroud*, 606 A.2d at 84; *Corwin*, 125 A.3d at 312.

[62] *Corwin*, 125 A.3d at 312 n.27 (quoting *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 899 (Del. Ch. 1999)).

## 1. SolarCity's Financial Woes

Plaintiffs argue that, at the time of the Merger, SolarCity was on the brink of insolvency.[63] This is not the picture painted by Tesla's disclosures.[64] The disclosures make general statements that SolarCity's future "access [to] the equity markets" was uncertain and that its liquidity position could be negatively affected by its upcoming earnings announcement.[65] Defendants argue these disclosures were accurate and sufficient; they vigorously dispute any contention that SolarCity was facing insolvency.[66]

There is a triable issue of fact as to SolarCity's ability to function as a going concern but for the Merger. Plaintiffs have provided evidence that: SolarCity was at serious risk of breaching the liquidity covenants in its revolver in 2016; SolarCity had limited options for outside financing; and SolarCity's advisors questioned whether the company had "sufficient cash to meet its obligations as they come

---

[63] Pls.' OB 56–59.

[64] *See* PX 137 ("Tesla Proxy") at 62, 65–66, 73, 105.

[65] Tesla Proxy at 61–62. This is a dispute over the truth of the disclosures, not the materiality of omitted facts. If SolarCity was careening towards insolvency when the Merger was approved, failing to disclose that fact undoubtedly would be material.

[66] *See* OA at 130.

due."[67] Defendants characterize Plaintiffs' evidence as outdated and misleading.[68] That may well prove to be true. For now, however, these are genuine disputes of material fact and it is desirable to inquire more thoroughly into them before adjudicating this claim.[69]

## 2. Evercore's Discounted Cash Flow Valuation

Next, Plaintiffs argue they are entitled to summary judgment on their disclosure claim because the Evercore financial analysis disclosed in Tesla's proxy was inadequate.[70] They zero in on whether Evercore adequately disclosed how it performed its discounted cash flow ("DCF") valuation of SolarCity in connection with its advice to the Tesla Board regarding the Merger.[71] Plaintiffs argue Evercore did not disclose that it relied on an assumption that the Solar Investment Tax Credit ("Solar ITC"), which was set to expire without Congressional action, would continue in perpetuity when choosing a 3–5% perpetual growth rate to calculate SolarCity's terminal value.[72] The Solar ITC was a significant source of value for

[67] PX 33 at 13; PX 19; PX 27 at 6; PX 112 at 3.

[68] Defs.' Answering Br. in Opp'n to Pls.' Mot. for Summ. J. ("AB") 37–47; DX 80 at 28; Rive Dep. 64:21–66:1.

[69] *Ebersole*, 180 A.2d at 468.

[70] Pls.' OB 66.

[71] *Id.*

[72] Pls.' AB 49–54.

SolarCity, and Plaintiffs have offered expert testimony that excluding it from the perpetual growth rate in a DCF of SolarCity would result in a share value of $6.14, far below the range of Evercore's valuations disclosed in the proxy.[73]

When stockholders vote on a merger, they are "entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[74] These disclosures must include "the valuation methods used to arrive at the [fairness] opinion as well as key inputs and the range of ultimate values generated by those analyses . . . ."[75] This summary need not be comprehensive; instead, the information disclosed need only be "sufficient for the stockholders to usefully comprehend, not recreate, the analysis."[76]

The methods Evercore used to create its valuations were adequately disclosed. The proxy disclosed that Evercore used a 3–5% perpetual growth rate for SolarCity in calculating SolarCity's terminal value.[77] While Plaintiffs argue this rate was too

---

[73] *Id.* at 52; Pls.' OB 32.

[74] *Pure Res.*, 808 A.2d at 449.

[75] *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203–04 (Del. Ch. 2007).

[76] *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *10 (Del. Ch. Jan. 30, 2017).

[77] Tesla Proxy at 77.

high, disputing Evercore's substantive analysis does not a disclosure claim make.[78] If stockholders thought this rate was too high, then they were free to discount, or reject altogether, Evercore's valuation. Given that the growth rate used to calculate SolarCity's value was disclosed, failing to disclose Evercore's tax assumptions in calculating that rate is immaterial as a matter of law.[79]

### 3. Elon Musk's Recusal

Tesla's proxy statement represented that Musk was recused "from any vote by the Tesla Board on matters relating to a potential acquisition of SolarCity, including evaluation, negotiation and approval of the economic terms of any such acquisition . . . ."[80] Musk himself stated on a conference call announcing the Merger that "I had no role in establishing this valuation for the offer that was made . . . I was fully recused from the matter, so I know about as much as you do about how this price was obtained."[81]

---

[78] *See In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) ("[Q]uibbles with a financial advisor's work simply cannot be the basis of a disclosure claim."); *In re JCC Hldg. Co., Inc.*, 843 A.2d at 721–22 (holding that a plaintiff cannot state a disclosure claim by "quibbling with the substance of a banker's opinion" or arguing that the opinion reaches the "wrong" conclusion on value).

[79] This, of course, does not mean that Plaintiffs' valuation evidence is not relevant to their claim that the Merger is the product of an unfair process resulting in an unfair price.

[80] Tesla Proxy at 59.

[81] PX 158 at 6.

Discovery has uncovered evidence that raises a genuine issue regarding whether these statements were accurate.[82] The parties quibble about what exactly the proxy's description of Musk's recusal means but, at the very least, Musk's statement that he was "fully recused" appears to be contradicted by some evidence, including the narrative in the proxy.[83] Whether these misstatements are material, however, cannot be resolved at this stage of the proceedings.

The materiality of Musk's undisclosed involvement in the process appears to rely on a predicate determination of his status as a controller. If Musk is a controller, then his involvement in the process beyond what was disclosed in the proxy would likely have been something a reasonable stockholder would have considered important when deciding whether to vote for the Merger. If, however, Musk was not a conflicted controller at the time of the Merger, then the discrepancy between the disclosures and actual events is far less likely to be material. This determination will be made after a trial.

---

[82] *See* PX 53; McBean Dep. 97:10–16, 287:17–288:15.

[83] *See* OA at 130 (Defendants' counsel arguing the statement means Musk was only recused from votes); OA at 97 (Plaintiffs' counsel arguing the statement means Musk was recused from votes and actual evaluation and negotiation of the merger). *See* Tesla Proxy at 558–59, 64, 66–67, 106 (discussing Musk's involvement in the deal process).

### 4. The Solar Roof

Plaintiffs argue that statements made by Defendants about the efficacy of SolarCity's "solar roof" product were materially misleading.[84] They point to statements by Musk touting the solar roof's *bona fides* as a currently viable product, and a comment made by Musk before the vote that the "first solar roof deployments will start next summer."[85] Defendants respond that Plaintiffs are misinterpreting appropriately qualified, forward-looking statements about a product in development.[86] Defendants did not argue in their briefing or at oral argument that these alleged misstatements were immaterial.

It cannot be disputed that the solar roof was years away from being a marketable product in late 2016.[87] The question is whether Defendants' statements discussing the solar roof adequately informed the voting shareholders that this was an unproven prototype not ready for prime time, or whether the suggestion was that this promising product was ready to roll off the shelves. There seem to be unsettled

---

[84] Pls.' AB 57. While they do not move for summary judgment on this disclosure claim, they argue it precludes summary judgment for Defendants.

[85] PX 146; PX 183.

[86] Defs.' Reply Br. in Supp. of their Mot. for Summ. J. ("Defs.' RB") 32.

[87] *See* PX 110 (Noting that SolarCity "has zero visibility on how much it is going to cost [to] make a solar roof, install it, R&D, where it will be manufactured, build up cost of getting raw materials, etc., [we are] running blind here which may be a big risk?"). Even now, the solar roof is not being produced in volume. *See* OA 104.

issues of material fact here; for instance: (1) were these disclosures understood as communicating the reality that the solar roof was years away from commercial production, or understood as claiming the solar roof would boost Tesla's fortunes in the nearer term?; and (2) perhaps more importantly, was the solar roof an important part of Tesla's value proposition for the SolarCity acquisition? Statements describing the solar roof as Tesla's "vision" for a "sustainable energy future" or that the "solar roof [] will generate sustainable energy from a rooftop that looks better and is more durable than a normal roof" could reasonably be interpreted either way.[88] Further inquiry is desirable.[89]

### 5. The Effect of the Transaction on Tesla's Financial Position

Last, Plaintiffs argue Defendants have not earned summary judgment on the disclosure claim because they falsely disclosed the Merger: (1) would be accretive to Tesla's earnings per share; and (2) add $500 million in cash to Tesla's balance sheet.[90] Defendants respond that representations concerning the financial impact of the transaction were appropriately qualified with disclaimers, and that the claim the

---

[88] PX 157.

[89] *Ebersole*, 180 A.2d at 470.

[90] Pls.' AB 61–62; PX 157.

Merger would add cash to Tesla's balance sheet was backed by summaries of SolarCity's cash flow.[91]

The statements Plaintiffs identify as misleading shareholders about the dilutive effect of the Merger are appropriately qualified. Tesla's proxy clearly notes that while it expected the Merger to be accretive in 2016, "[t]he Merger may not be accretive and may cause dilution to Tesla's earnings per share . . . based on preliminary estimates which may materially change . . . ."[92] No reasonable stockholder would read these appropriately qualified statements as anything approaching a guarantee.

Likewise, the claim that Tesla expected the Merger to add $500 million to Tesla's balance sheet "over the next 3 years" is not misleading.[93] The blog post containing this statement points readers to the Tesla proxy, which includes SolarCity's projected net cash generation.[94] That these projections may not bear fruit is a risk identified by the proxy and presumably understood by investors.[95]

---

[91] Defs.' RB 34–36; Tesla Proxy 102–05.

[92] Tesla Proxy at 47.

[93] PX 157.

[94] *See id.*; Tesla Proxy 102–05.

[95] Tesla Proxy 103–05.

The financial projections here were "accurately described and appropriately qualified; that is sufficient."[96]

### C. There are Genuine Disputes of Material Fact as to the Independence of Tesla's Board

Plaintiffs maintain there is no genuine issue of material fact that the majority of Tesla's Board faced disqualifying conflicts of interest, which, combined with the allegedly misleading disclosures, mandates entire fairness review of the transaction regardless of Musk's status as a controller.[97] Defendants respond that trial is necessary to determine director independence.[98]

"Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."[99] There is "'no dilution' of the duty of loyalty when a director 'holds dual or multiple' fiduciary obligations."[100] "If the interests of the beneficiaries to whom the dual fiduciary owes duties . . . diverge, the fiduciary faces an inherent conflict of

---

[96] *PNB*, 2006 WL 2403999, at *20.

[97] Pls.' OB 42–54.

[98] *See* Defs.' OB 9–29.

[99] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993).

[100] *Trados*, 73 A.3d at 47 (quoting *Weinberger*, 457 A.2d at 710).

interest."[101] Directors may also be found to lack independence when they are beholden to an interested party.[102] This is a "fact-specific determination made in the context of a particular case."[103]

Plaintiffs allege each member of Tesla's Board was a dual fiduciary, stood on both sides of the Merger or was otherwise conflicted through a personal or business relationship with Musk.[104] The members of Tesla's Board voting on the Merger were Kimbal Musk, Steve Jurvetson, Ira Ehrenpreis, Brad Buss and Robyn Denholm; Elon Musk and Antonio Gracias were recused from the vote.[105] For purposes of Plaintiffs' motion only, Defendants concede that Kimbal Musk was conflicted.[106] Therefore, for Plaintiffs to earn partial summary judgment, they must demonstrate there is no genuine dispute of material fact that Jurvetson, Ehrenpreis,

---

[101] *Id.* at 47–48.

[102] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016).

[103] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004).

[104] Pls.' OB 44–55.

[105] Tesla Proxy at 69.

[106] Defs.' AB 18 n.15.

Buss or Denholm labored under disabling conflicts.[107] While Plaintiffs may succeed at trial, they cannot make the required showing on summary judgment.[108]

### 1. Steve Jurvetson

Plaintiffs argue that Jurvetson is a dual fiduciary for two reasons. First, he sits on the board of Space Exploration Technologies Company ("SpaceX"), a separate Musk-controlled entity.[109] SpaceX owned SolarCity bonds.[110] Therefore, Plaintiffs say Jurvetson owed a duty to SpaceX shareholders to maximize the return received from the SolarCity bonds.[111] Second, Plaintiffs note that Draper Fisher Jurvetson ("DFJ"), the venture capital firm where Jurvetson served as managing partner until 2017, owned millions of shares of SolarCity stock at the time of the

---

[107] Plaintiffs argue that Musk's and Gracias's recusals should not be credited, meaning they only have to show Kimbal Musk and one other voting director were conflicted. Pls.' Reply Br. in Supp. of Their Mot. for Partial Summ. J. ("Pls.' RB") 7. While this may be proven at trial, Plaintiffs cannot show there is no genuine dispute of material fact regarding whether Musk and Gracias's recusals were illusory.

[108] Plaintiffs base their motion, in part, on arguments that each director is too beholden to Musk to exercise his or her independent business judgment. Pls.' OB 42–54. This fact-intensive issue will be decided, in part, based on the predicate determination of Musk's status as a controller. The present discussion of whether the directors were conflicted will focus on questions of self-dealing and dual fiduciary status.

[109] Pls.' RB 8–9

[110] Tesla Proxy at 108.

[111] Pls.' RB at 8–9.

31

Merger.[112]  Given his fiduciary obligations to SpaceX shareholders and DFJ investors to maximize the value of SolarCity, along with his fiduciary duty to Tesla shareholders, I agree with Plaintiffs that Jurvetson is a dual fiduciary as a matter of law.[113]  With that said, there are open material factual issues regarding whether the interests of Tesla and SpaceX shareholders and DFJ investors were (or were not) aligned in the Merger that will be explored at trial.

## 2. Ira Ehrenpreis

Ehrenpreis also faces a potential dual-fiduciary problem, although of a nature less direct than Jurvetson's.  Ehrenpreis is a principal of DBL Partners, a venture capital firm that has made significant investments in SpaceX.[114]  As noted, SpaceX held millions of dollars of SolarCity bonds at the time of the Merger.  Again, whether the interests of Tesla and SpaceX stockholders were (or were not) aligned will be decided after trial.

---

[112] PX 149 at 8–9.

[113] *Trados*, 73 A.3d at 46–47.

[114] Ehrenpreis Dep. 17:3–18:7.

### 3. Brad Buss

Plaintiffs' allegations that Buss lacks independence stem from his ownership of 37,277 shares of SolarCity stock at the time of the Merger.[115] This ownership, Plaintiffs argue, is an example of "disparate consideration" that poses a "disabling conflict of interest."[116] Defendants counter that Plaintiffs need to show this investment was material to Buss, and that his far larger investment in Tesla aligned his interests with Tesla's stockholders.[117]

When considering whether a director's financial holdings improperly influenced his fiduciary conduct, this court considers whether those holdings were "of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to [] shareholders without being influenced by her overriding personal interest . . . ."[118] Defendants have pointed to Buss's substantial personal wealth and far larger stake in Tesla stock as evidence that his SolarCity stock

---

[115] Tesla Proxy at 107; PX 151 at 8.

[116] Pls.' RB 10 (quoting *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *3 (Del. Ch. Mar. 6, 2012).

[117] Defs.' AB 25–27.

[118] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999). *See also Cede*, 634 A.2d at 364 ("A trial court must have flexibility in determining whether an officer's or director's interest in a challenged board-approved transaction is sufficiently material to find the director to have breached his duty of loyalty . . . .").

ownership is not materially important to him.[119] This is a genuine dispute of material fact that precludes summary judgment for Plaintiffs.

### 4. Robin Denholm

Plaintiffs' allegations that Denholm lacked independence are threadbare. Denholm is indisputably not a dual fiduciary in the current transaction and she indisputably had no financial interest in SolarCity.[120] Plaintiffs point to her compensation as a Tesla director and the fact that she is "friends with her fellow directors" as evidence she lacks independence.[121] Merely showing that Denholm was well compensated for her service as a Tesla director or that she had social relationships with other directors, without more, does not extinguish issues of material fact as to whether she is independent.[122]

### D. There Is a Genuine Dispute of Material Fact as to Whether the Merger Constitutes Waste

"To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate

---

[119] Defs.' AB 25–27.

[120] Defs.' AB 18; Pls.' RB 11; PX 107.

[121] Pls.' OB 54.

[122] *In re Ltd., Inc.*, 2002 WL 537692, at *4–5 (Del. Ch. Mar. 27, 2002).

consideration.'"[123]   These are frequently "unconscionable cases where directors irrationally squander or give away corporate assets."[124]   Where fully informed stockholders approve a transaction, waste will be extremely difficult to prove as "it has been understood that stockholders would be unlikely to approve a transaction that is wasteful."[125]

While a claim for waste is difficult to prove, it is not impossible. Plaintiffs claim they will show at trial that SolarCity was worth almost nothing when the Merger was consummated.[126]   If SolarCity was, in fact, insolvent when Tesla acquired it, that proof may well sustain a waste claim.[127]

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Partial Motion for Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is **GRANTED in part** with respect to the discreet claims challenging the disclosures regarding Evercore's

---

[123] *Disney*, 906 A.2d at 74 (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).

[124] *Brehm*, 746 A.2d at 263.

[125] *Singh*, 137 A.3d at 151–52.

[126] Pls.' AB 63–66.

[127] The stockholder vote does not change this. If SolarCity was insolvent, something clearly not in Tesla's disclosures, the vote was uninformed, negating the effect of the shareholder vote. *Cf. Huizenga*, 751 A.2d at 901 (noting how a "fully informed" vote of stockholders approving a transaction warrants dismissing waste claims).

valuation analysis and the predicted financial impact of the Merger on Tesla, and **DENIED in part** as to all other claims.

**IT IS SO ORDERED.**